The American Insurance Company *vs.* Ogden & McComb.

In the *insurance* of a vessel on *time,* the *warranty* of *seaworthiness* is complied with, if the vessel be in an unexceptionable condition at the commencement of the risk ; and the fact that she subsequently sustained damage, and was not properly re-fitted at an intermediate port, does not discharge the insurer from subsequent risk or loss, provided such loss be not the consequence of the omission.

A *defect* of *seaworthiness,* arising after the commencement of the risk, and permitted to continue from bad faith or want of ordinary prudence or diligence on the part of the owner or his agents, discharges the underwriter from liability for any loss, *the consequence of such want of faith, prudence or diligence;* but does not affect the contract of insurance *as to any other risk or loss* covered by the policy, and not caused or increased by such particular defect.

The insurer is not liable either in the case of a *technical total loss* or *actual loss,* where it appears that the *necessity* the *prima facie* ground of abandonment though real, was yet the result of *culpable negligence,* or want of *due diligence* on the part of the owner or his agents.

Under ordinary circumstances, a vessel cannot be abandoned as for a constructive or technical total loss on the ground of the inability of the master to obtain funds to make necessary repairs, where the owner is chargeable with want of *ordinary prudence* in furnishing *funds* or *credit,* and especially where he has deprived the master of the means ordinarily possessed by him to obtain funds or credit.

In determining the right to abandon as for a *technical total loss* in reference to the cost of repairs, the parties, *it seems,* are concluded by the sum inserted in the policy as the value of the vessel, and are not allowed to give proof of its *real value.*

Error from the supreme court. Ogden and M'Comb brought an action in the *superior court of law of the city of New-York,* on a policy of insurance underwritten by the American Insurance Company, on *three-fourths* of a schooner, in the names of Ogden & M'Comb, as the agents of the owner—loss payable to them. The policy was on *time,* for six months from the 17th of November, 1829—sum insured, $1,800. The vessel sailed the 26th November, on a voyage from *New-York* to *Charleston,* from thence to *Norfolk,* and from thence to *St. Thomas,* in the West Indies. Whilst going into Charleston harbor, and while the vessel was in charge of a pilot, the small *bower anchor* was lost on the outward bar. The schooner did not go up to the city, but discharged her cargo, which consisted of stone, about one

and a half miles from the city.   The vessel remained in the harbor five or six days; the pilot engaged to get up the anchor, but did not do so; and the wind being fair, the schooner sailed for *Norfolk*, where she arrived in safety.   On her arrival there, the master made inquiries for an anchor, but could not procure one of a suitable size; those he saw were too *heavy* or too *light*. He remained at Norfolk nine or ten days, took in a cargo of shingles, and proceeded on his voyage to *St. Thomas*, on the 7th January.   Three days afterwards, the schooner sprung aleak, in consequence of a heavy cross sea, and in three days more, she encountered a severe gale of wind, with a heavy sea; her sails were split, and the mainmast sprung, and the vessel became very leaky.   She however succeeded in reaching *St. Thomas* on the 25th January.   The master, after making inquiries of mechanics, made an estimate that the vessel could not be repaired and rendered seaworthy for less than $1,700.   The cargo was discharged, and a survey was taken of the vessel by three surveyors appointed by the U. S. consul, who reported that the repairs might be made for $800 or $900.   The master was wholly destitute of funds; the consignees of the cargo refused to make advances, the *freight* having been previously drawn for, and they holding a protested draft for the same; and money could not be obtained on *bottomry*, although the master attempted to raise money in that way for the purpose of making repairs. Under these circumstances, the vessel was sold at auction, and brought only the sum of $388,32.   The plaintiffs abandoned as for a *total loss*.   The insurance company offered to pay the *damage* as estimated by the surveyors at St. Thomas; which offer the plaintiffs refused, and brought their suit.   The counsel for the defendants requested the judge to charge the jury, 1. That St. Thomas being the port of destination, the inability of the master to procure there the necessary funds for repairing the vessel, was not a sufficient ground of abandonment; 2. That the policy being on time, the warranty of seaworthiness attached as a condition precedent at the commencement of each voyage during the period which it covered, and that it being admitted

American Insurance Company *v.* Ogden,

that the vessel was unseaworthy from the want of an anchor when she left Charleston, and also when she left Norfolk, the defendants were discharged from all subsequent perils ; or if the judge was of a different opinion, that then he should charge that the evidence was not sufficient to excuse the *laches* of the master in not recovering his anchor or obtaining a new one at *Charleston*, and that therefore the defendants were discharged from all subsequent liability ; and 3. That if the judge should be of opinion that the *laches* of the master at Charleston were sufficiently excused, then that he should charge the jury that it was the duty of the master, after his arrival at *Norfolk*, if an anchor could not there be obtained, to procure one from a neighboring port ; and if the jury should be of opinion that, by sending to Baltimore or New-York, or any other neighboring port, the master could have obtained an anchor without an unreasonable delay of the voyage, then that the defendants were entitled to their verdict. The judge charged the jury that the inability of the master to procure the necessary funds at St. Thomas was a valid cause of abandonment ; and further instructed them that the vessel continued to be covered by the policy during the voyage, and that the plaintiffs were entitled to recover if the negligence and laches imputed to the master were sufficiently excused, and that the material question of fact on that point was whether the master made use of due diligence at Norfolk to obtain an anchor. The defendants excepted to the charge. The jury found a verdict for the plaintiffs for $2,161, on which judgment was rendered. The defendants sued out a writ of error, and removed the record into the *supreme court*, where the judgment was *affirmed*. See opinions delivered in supreme court, 15 *Wendell*, 535, *et seq*. The defendants thereupon removed the record into this court, where the cause was argued by :

*D. Lord, jun.* for the plaintiffs in error.

*S. P. Staples,* for the defendants in error.

*Points for the plaintiffs in error:*

I. The warranty of sea-worthiness is a condition going to the whole contract of insurance. It attached as a condition at Charleston, and at Norfolk; and was broken by the sailing without a small bower anchor, and thus in a confessedly unfit state for the voyage; and the court erred, in not having thus charged the jury, as requested by the defendants' counsel. *Putnam* v. *Ward,* 3 *Mass. R.* 481. 2 *Phil. on Ins.* 114, 115. *Franklin* v. *Shaw,* 11 *Pick.* 227.

II. There was no legal evidence upon which could be submitted to the jury, the question of an excuse or laches at Charleston or Norfolk : 1. Because the master had no right to go to sea on a blind expectation of picking up an anchor he had lost in the ocean. 2. Because he had no funds nor credit to get an anchor at Charleston, and therefore there was no place for the exercise of diligence on the subject, and none was in fact exercised. 3. Because at Norfolk he had no funds, and he does not show that he had any credit; and for these reasons also no deligence there could be otherwise than illusory.

III. The breach of the condition of seaworthiness discharges the insurer from all subsequent losses, and is not a mere exemption from the consequences of the defect. *Phil. on Ins.* 117. 2 *id.* 103. *Park on Ins. ch.* 11, *of seaworthiness.* *Hughes on Ins.* 263, 269. *Christie* v. *Secretan,* 8 *T. R.* 192. *Silva* v. *Low,* 1 *Johns. Cas.* 184, 198. *Craig* v. *United States Ins. Co. Peters'* *C. C. R.* 410, 416. *Wilkie* v. *Geddes,* 3 *Dow,* 60. It is a condition annulling the contract; not a promise merely assuming the consequences of a deficiency. All the doctrines of insurance law pronounce the contract void after the condition or warranty is broken. A different rule as to warranties in insurance would defeat all the protection afforded by them, from the want of connexion, control or knowledge by the insurer in respect to the property insured while absent on the voyage. The only exception, if any, is where the ship having been unseaworthy, has been made seaworthy before the loss. *Weir* v. *Aberdeen,* 2 *Barn. & Ald.* 320. *See Hughes,* 269, 270. A deviation has

the effect of discharging the contract, and not merely of throw-ing consequences on the insured. So of misrepresentation or concealment. 1 *Phil. on Ins.* 110. So of any breach of war-ranty. *id.* 127, *and cases cited.*

IV. The inability of the master at St. Thomas, to procure the necessary funds, was not a valid cause of abandonment. *See Peale* v. *Mer. Ins. Co.* 3 *Mason,* 65. 2 *Marsh,* 562. *Hughes,* 387. 1 *Phil.* 389.

1. Because such inability arose from culpable neglect and remissness in sending the vessel on the voyages without funds, without credit, and without the ordinary resources afforded by the freight. *Van Buren* v. *Wilson,* 9 *Cowen,* 168.

2. Because this inability is a circumstance merely personal to the party in the adventure, and does not grow out of the perils of the sea, or any thing connected with the usual course of trade on which the contract is based. Sale of cargo for necessities of the vessel, is not a loss for which the insurer is responsible. *Hughes,* 219, 220.

3. Because such a rule would make the same extent of loss, in a vessel of the same value and at the same port, *a ground* of abandonment, where the insured had withdrawn all his funds and had no credit : and *no ground* of abandonment where the insured had funds or credit : and thus introduce a capricious inequality.

4. Because, the rule being settled, that where the repairs are practicable, the vessel is not deemed subject to abandonment unless the repairs (deducting one-third new for old) exceed half the value of the repaired vessel ; therefore it is the duty of the *assured* to retain and repair his vessel : his inability to discharge this duty is his misfortune or fault, and not that of the insurer. It is similar to the master's agency : if the vessel be damaged beyond half her value, he is agent of the assurers ; if within half her value, of the assured. 1 *Phil. on Ins.* 468.

5. The rule "that the right of abandonment is to be judged of by all the circumstances of each particular case," is to be understood in relation to the circumstances of the property itself, and not to the circumstances of the insurer ; and in relation to the various circumstances which have in law been heretofore

held grounds of abandonment; otherwise the rule becomes futile from its indefiniteness.

6. The rule contended for by the plaintiffs in error, contemplates only a reasonable obligation to provide some means for the vessel at the known ports of destination. And if the rule of abandonment now contended for applies at the port of destination, it will equally apply at the port of departure; so that a trivial accident to a ship in the very port of the owner, would warrant an abandonment if he were insolvent.

7. The mere good faith of the master, in abandoning or selling his ship does not create a total loss, unless the circumstances upon which he acted of themselves were a ground of abandonment. *Patapsco Ins. Co.* v. *Ivrethgate*, 2 *Pick*. 26. 5 *Peters*, 621. 2 *Phil. on Ins.* 292.

*Points for the defendants in error :*

I. The nonsuit was correctly refused.

II. The charge of the court, that the inability to procure funds at St. Thomas was a sufficient cause of abandonment, was correct. 1 *Phil. on Ins.* 11. *Read* v. *Bonham*, 3 *Brod. & Bing.* 384. 1 *Bing.* 445. *American Ins. Co.* v. *Center*, 4 *Wendell*, 46.

III. The charge of the court, that if due diligence had been used to keep the vessel seaworthy she was covered by the policy, was correct; and the judgment ought to be affirmed with costs. *Wier* v. *Aberdeen*, 2 *Barn. & Adol*. 320. *Hughes on Ins.* 269, &c. *Holdiworth* v. *Weir*, 1 *Man. & Ryl.* 673. *Paddock* v. *Frank. Ins. Co.* 11 *Pick.* 227, 233. 2 *Phil. on Ins.* 115. *Cotheal* v. *Jeff. Ins. Co.* 7 *Wendell*, 81.

After advisement, the following opinions were delivered :

By the CHANCELLOR. Two questions are presented for the consideration of the court in this case : 1st. Whether there was a breach of the implied warranty of seaworthiness, by the departure of the ship from Charleston, on her second passage after the commencement of the risk without providing a new anchor in

American Insurance Company *v*. Ogden.

the place of the one that was lost in going into that port; and 2. Whether the master was justified in selling the vessel, for the want of funds to repair, in her third port of discharge after the commencement of the risk; although the actual cost of repairs, at that port, deducting one third new for old, would, if the master had been furnished with funds or had possessed the ordinary means of obtaining them, have been less than half the value of the vessel as fixed by the parties in the policy.

The fact that the loss of the anchor rendered the vessel unseaworthy, even for the coasting trade, was not disputed on the trial; although the damage which afterwards occurred to the vessel upon her passage from Norfolk to St. Thomas was, in fact, in no way attributable to the want of a second anchor. If upon a time policy, like the present, the implied warranty that the vessel is seaworthy, applies to the commencement of each separate passage during the continuance of the risk, even where such unseaworthiness has been caused by the perils insured against, then it was perfectly immaterial whether the master had or had not a reasonable excuse for leaving either the port of Charleston or the port of Norfolk without re-placing the small bower anchor which was lost upon the Charleston bar. On the other hand, if there was no such warranty of seaworthiness, then as the anchor was lost by a peril insured against, and the subsequent damage to the vessel at sea was in no way caused by the negligence of the master in not procuring an anchor previous to his departure from Norfolk, the question whether the anchor could have been procured with reasonable diligence does not appear to have been a proper subject for the consideration of the jury; or at least the underwriters could not complain of that part of the charge which related to the excuse of the master for not supplying himself with a new anchor. Departing from the port of Norfolk in an unseaworthy state, either with or without excuse for not supplying the loss of the anchor, might have deprived his owners of the benefit of an insurance, for that passage, upon the freight and might also have rendered them liable to to the shippers for any damages sustained by the latter if the shingles

American Insurance Company *v.* Ogden.

had been lost and the policy upon such cargo had been avoided on account of the unseaworthiness of the vessel. But if there was, as between the owners of the vessel, and the underwriters upon this time policy thereon, no implied warranty of seaworthiness for this particular passage, in reference to this damage, sustained upon a previous passage by one of the perils insured against, the underwriters could only be discharged from their liability on the ground that the subsequent damage or loss either certainly was, or that it might possibly have been, caused by the negligence of the master, in not using due diligence to render his vessel seaworthy after the previous accident ; and not where as in this case, it is evident that the subsequent loss or damage must have arisen from other causes exclusively.

In ordinary cases, the implied warranty of seaworthiness only applies to the commencement of the adventure, or risk, and not to any intermediate port of destination during the continuance of the adventure, or voyage, unless such unseaworthiness is caused by some accident or peril not covered by the policy. And if the warranty is complied with at the commencement of the voyage, or risk, and the vessel is afterwards injured and rendered unseaworthy by a peril insured against, it is only necessary that the master should use reasonable diligence to put her in a proper situation to proceed on her voyage ; and where there has been negligence on the part of the master in this respect, the underwriters are only excused from the payment of the subsequent damage or loss which may have been caused or sustained, by the want of such due diligence. *Peters* v. *The Phœnix Ins. Co.* 3 *Serg. & Rawle*, 25 ; *Paddock* v. *The Franklin Ins. Co.* 11 *Pick.* 227. It is supposed, however, by the counsel for the plaintiffs in error, that these principles are not applicable to an insurance upon a time policy ; that such a policy is in the nature of a separate insurance upon each voyage or passage which is undertaken by the assured during the continuance of the risk : and that the underwriter is not liable upon his policy if the vessel is not seaworthy at the time of her departure from each port or place of destination, in the course of her business,

during the continuance of the risk; although the subsequent damage or loss is in no way attributable to such unseaworthiness. If this is the legal construction of a time policy, then it is certain that the underwriters are not liable for the loss in the present case, as this is a time policy in the broadest sense of the term. It was a policy upon the vessel only, for six months from the 17th November, 1829; without reference to the port or place where she then was, or any port or ports of departure or destination, or any particular voyages or passages upon which she was to be sent during the continuance of the risk. It does not appear by the evidence where the vessel was at the commencement of the risk; although it may be fairly inferred therefrom that she was either in the port of New-York, or at some of the stone quarries in the neighborhood, as she sailed from that port for Charleston about a week afterwards, with a full cargo of stone, fully manned and equipped, and perfectly seaworthy for that voyage or passage.

Much may undoubtedly be said in favor of applying the principle of an implied warranty of seaworthiness in a policy upon a vessel on time merely, to each successive passage or voyage during the continuance of the risk, where the unseaworthiness at the commencement of the second or subsequent voyage or passage had not been caused by the perils insured against; as the assured ought not to be tempted, in any case, to risk the lives of the crew or the property of others unnecessarily, by putting out to sea without taking all the usual precautions to guard against accidents. But it is a well known fact, that various opinions exist in different places as to what is necessary to render a vessel perfectly seaworthy, and what would be deemed requisite by the customs of one port or country, might not be required by the customs of another. Neither public policy or the interests of commerce, therefore, require the extension of the principle of implied warranties upon marine insurances, in this respect, farther than they have been carried by the courts of this country and of England, in previous cases. I have not been able to find any case in which it has been held that a time policy differed from an ordinary policy upon a voyage to different ports, where

there was an insurance upon the vessel for the entire voyage or adventure, so far as regards the warranty of seaworthiness; on the contrary, there are cases, both in this country and in England, in which it has been held that upon a time policy, where the implied warranty of seaworthiness was complied with at the commencement of the adventure or first voyage or passage, the underwriter was not discharged from the payment of damages accrued subsequent to an injury which rendered the vessel unseaworthy, and which had not been fully repaired the first opportunity. Thus, in the case of *Brooks* v. *The Oriental Ins. Co.* 7 *Pick.* 259, which was a time policy much like the present, where the vessel was insured for twelve months, from Salem to any port or ports on the globe, one or more times, and the vessel, on one of her passages from Boston to Brazil, was disabled by the perils of the sea, the assured was permitted to recover for subsequent damage to the vessel by the risks insured against, although she had not been fully repaired, so as to render her again seaworthy, at either of the ports of Bahia, Havana or New Orleans, to which ports she successively went, in the course of her trading voyages, after the first disaster which rendered her unseaworthy. And in the recent case of *Hollingworth* v. *Broderick*, which came before the court of king's bench in England in May, 1837, 1 *Lond. Jurist*, *p.* 430, in an action upon a time policy by the assured against the underwriter, the defendant pleaded in bar of the action that subsequent to the policy, and before the loss, the ship became broken, damaged and unseaworthy, and that by care and diligence, and with little expense, she could have been rendered seaworthy, but that the assured neglected to make such repairs, by reason whereof she remained unseaworthy until the time of the loss. And, upon demurrer to this plea, Lord Denman and the other judges of that court held that the plea formed no defence to the action, as it was not averred that the vessel was lost in consequence of such unseaworthiness; and that the implied warranty only applied to the commencement of the adventure or risk. I am satisfied, therefore, in the present case, that the assured were entitled to recover for the subsequent damage to the vessel, although she had been previously rendered

unseaworthy by the loss of the small bower anchor, and conti-
nued so unseaworthy at the time of the disaster, upon her pas-
sage from Norfolk to St. Thomas. It only remains to consider
whether the underwriters were liable for a *total* or only for a
*partial* loss.

The insurance by this company was upon three-fourths of the
vessel only, and valued at $1,800 ; the whole vessel therefore,
was valued at $2,400. And if this is, for the purposes of the
policy, to be taken as her real value in ascertaining whether she
could have been repaired for less than one-half her value, deduct-
ing one-third new for old, then there is no pretence that the
assured had a right to abandon on that account ; as the very
highest estimate of repairs at St. Thomas was but $1,700. That
sum, after deducting one-third new for old, would leave the cost
of repairs but $1,133.33, or less than half the value as stipulated
in the policy. I am aware that in the case of *Peale* v. *The Mer-
chants' Ins. Co.*, 3 *Mason's R.* 27, Judge Story, whose opinion
is entitled to great weight upon a question of insurance, held that
the value of the vessel as agreed upon by the parties, and inserted
in the policy, was not to be taken as the true value in determining
whether the repairs would exceed half her value, in reference to
the question of abandonment. He also decided in that case that
in determining the same question, the deduction of one-third new
for old was not to be made from the estimated amount of the
repairs. In the first insurance cause which came before me as a
circuit judge, I followed his decision as to the first point, but not
as to the last ; although I had at the time some doubts as to the
correctness of his decision upon both points. But as the coun-
sel for the assured, in whose favor I decided the first question,
were not willing to risk their client's cause upon the correctness
of the decision in the case of *Peale* v. *The Merchants' Ins. Co.*
on that point, they waived the benefit of the decision in their
favor, and consented that the valuation of the vessel, as contained
in the policy, should be considered as her true value upon the

question of abandonment.   That point therefore was not before
the superior courts of this state when the case afterwards came
up for review upon other questions which arose at the trial.
But when the case was before *this court*, I availed myself of that
opportunity to say, that subsequent investigation and reflection
had not weakened the doubts which I had previously entertained
as to the correctness of Judge Story's opinion upon the question
as to the valuation in the policy.   I was not, however, aware
even at that time, that the judgment or decree in the case of
*Peale* v. *The Merchants' Ins. Co.* had been reversed upon the ques-
tion of jurisdiction, or at least that it had found its way again
in the state courts, and that the decision of Judge Story upon
many of the points involved in the cause, had not been sustained.
It now appears that the supreme court of Massachusetts has
expressly overruled his decisions in that case, not only as to the
deduction of one-third new for old, so as to settle that question
in conformity with the reported decisions of the courts in this
state, but also as to the conclusiveness of the valuation in the
policy ; in which decisions of the state court I most fully con-
cur.   Upon this last question, it appears to be impossible to add
to the strong and conclusive reasoning of Putnam, J. who deli-
vered the opinion of the supreme court of Massachusetts in the
recent case of *Deblois* v. *The Ocean Ins. Co.* 16 *Pick. R.* 312.
He says, ".In regard to the value, we must recollect it was fixed
by the agreement of the parties.   It is admitted that if the vessel
were absolutely lost when returning to her home port, after a
three years' voyage and essential deterioration, the value in the
policy should be paid.   And we cannot perceive any good rea-
son why that value should not govern as well when the assured
claims for a technical total loss as when he claims for a loss by
the total destruction of the ship ; and why it should not govern
when the assured would lose, as well as when he would gain by
it.   It seems to us that we should have just as much right to set
aside the valuation if the vessel should be burnt, or otherwise
actually destroyed, when she had become deteriorated in value,

American Insurance Company *v.* Ogden.

as to say that it should be set aside in the decision of the question whether or not a technical total loss had happened. If in the case of the utter destruction, the underwriters would not be permitted to prove that she was not worth half as much when she was lost as when the voyage commenced, why should the assured be permitted to prove that she had deteriorated to that extent in order to make an abandonment as for a technical total loss, which could not be otherwise maintained ? It would, we think, be making a new contract, which would be essentially different in point of mutuality. If the vessel sustained damage at a time when she was in great demand the owner would repair her. If at a place where there was an embargo and where vessels were of comparatively little value; then he would work up her repairs to more than half her value in the market there, claim for the whole, and throw the vessel upon the underwriter. Wreck or not, total or partial loss, would depend upon the ever shifting state of the market, and not, as it should, upon the condition of the ship. She might be almost worthless at the place where she was damaged, and in another, perhaps not a distant port, would sustain a fair and reasonable value. To avoid these and other uncertainties and causes of litigation and dispute, the parties agreed upon the valuation in the policy. It was to continue the same although the vessel should grow worse. It was to continue the same wherever she might go under the policy, although she might, in some places, be worth more and in some places less than the value agreed upon. It was to be co-extensive with the voyage, as to time and place." To what has been so well said on this subject, by another, I will merely add, that by adhering to the valuation of the vessel as fixed by the parties in the policy, much litigation will be prevented, which is generally a serious injury to the assured. He will then have a fixed and certain rule by which to ascertain and determine his right to abandon, upon a mere computation, after he has ascertained the amount of repairs which will be required fully to restore the vessel to the state she was in previous to the disaster, by a regu-

lar estimate and survey by competent persons at the port of neces-
sity. Such a mode of ascertaining the right to abandon will
generally prove satisfactory to underwriters, and will enable
them, at once, to determine whether to accept or to reject the
abandonment. But if the valuation of the vessel in the policy is
to be departed from, and the actual value of the ship at the port
of necessity is also to be ascertained from the uncertain and con-
flicting opinions of persons remote from both parties, before the
underwriters can determine whether they will accept or reject
the abandonment, the assured must, in the end, be the principal
sufferer by the delay and litigation, which must arise from such
a departure from the rule of value adopted by the parties them-
selves. I therefore think the value of the vessel as fixed upon
by the policy should be considered as conclusive between the
parties, in determining the question whether the extent of the
injury was such as to authorize an abandonment as for a techni-
cal total loss ; as it is for the purpose of ascertaining the amount
which the assured is to recover for the loss of his vessel if he
succeeds in turning it into a technical total loss. And there was
no evidence in the present case which could authorize the jury
to find a verdict in favor of the assured for a total loss on the
ground that the expense of repairs would exceed the half of the
value of the vessel, within the meaning of the legal rule on that
subject.

The rule of permitting the assured to abandon when the vessel
has been injured to more than half the value, does not exist in
England. It was first adopted in this country from a similar
rule, in relation to an insurance upon the cargo, in some of the
other maritime countries of Europe ; and among others, in
France, according to Pothier. *See Clericæ* 278, *Le Guidon De
La Mer, ch.* 7, § 1 ; *Pothier Traite Du Cont. D'Assur. No.* 118.
And it is now adopted as a part of the maritime law of France
in terms, by the more recent commercial code of Napoleon ;
except that the new code requires that the loss should be at least
three-fourths of the value of the property assured, to authorize
an abandonment on that account. *Code de Com. art.* 369. As
this principle of adopting an arbitrary rule of proportion, between

the value of the vessel, and the expense of repairing her at the port of distress, for the purpose of ascertaining the right of the assured to abandon as for a total loss, was substituted for the more uncertain rule which exists in England, of leaving it to the jury to determine, as a matter of fact in all cases, whether the situation of the vessel was such as to make it a justifiable case of abandonment, or of a sale of the ship for the benefit of all parties, the courts of this country should be cautious how they depart from the established rule, or they will find the underwriters and the assured again involved in the ruinous litigation, which the adoption of a fixed and certain rule was intended to obviate. I agree that there may be cases, where the vessel is stranded, with partial wreck, or is rendered otherwise innavigable at a distance from any regular port, and where the means of repair or the necessary funds for that purpose could not have been procured, even if the master was furnished with the ordinary powers to obtain them, in which, from the necessity of the case, there must be an abandonment or sale of the wreck of the ship. *Pardessus* admits that such cases may exist even under the present commercial code of France ; the 390th article of which declares that an abandonment on the ground of incapacity to navigate, cannot be made if the vessel stranded (*echoue*) may be gotten off, repaired, and put in a state to continue her course to her place of destination. *Pard. De Droit, Com. part.* 3, *tit.* 5, *ch.* 3, § 4, *n.* 842. *Tome* 3, *p.* 370.

In the case now under consideration, however, there was no impossibility of repairing the vessel, as in the case put by *Pardessus*, on the ground that she was in a place where there was no money to borrow, or workmen or materials to be procured on credit, to make the repairs. Here the vessel was in one of her regular ports of destination, with her cargo on board when she arrived in a disabled state ; the impossibility, if any, of procuring funds on credit to make the repairs, arose from the fact that the master, either by his own fault, or by the improvidence of his owners, was not only deprived of the benefit of his and their personal credit, but was divested of all the other means,

except the vessel itself, which the law places under his control, for the repair and preservation of the ship. I therefore concur in the opinion expressed by Mr. Justice Bronson in the supreme court, that this was not a proper case for converting what was in fact only a partial loss into a total loss, for the purpose of charging the underwriters with a greater amount than they ought to be compelled to pay, according to the terms of the policy, and giving to the assured a greater sum in damages than in justice and equity they ought to recover. It may be proper to remark, that the part of the decision of Judge Story, in the case of *Peale* v. *The Merchants' Ins. Co.*, which is relied upon by the two members of the supreme court, who differed in opinion with Mr. Justice Bronson in this case, has not been sustained in the state of Massachusetts, in the subsequent cases which arose on the same or similar policies on that vessel ; and in some more recent decisions in the supreme court of that state. The principle of submitting it to a jury in each case, to decide what a prudent owner would do for the purpose of determining the right of the assured to abandon, would necessarily lead to ruinous litigation, and would deprive both the insurers and the assured of all the benefits intended to be secured to them by the adoption of the rule as to the extent of the repairs exceeding half the value of the vessel. It appears to me to be wholly inconsistent with reason and justice to permit both rules to stand together. The question as to what a prudent owner would do, may be a very proper rule of decision in a case of stranding, and before it is known whether the vessel can be gotten off, or what injury she has sustained or may sustain in her then situation ; and the other rule cannot be applied to such a case. But the adoption of such a principle in other cases, where the vessel is safely moored in a regular port, would probably have the effect here, as it already had in England, of compelling underwriters to insert a stipulation in the policy that there shall be no abandonment except in case of capture or detention, or where the vessel is stranded. I will only add, that I fully concur in the reasons urged by Mr. Justice Bronson against the conclusion at which his brethren had arrived in this

American Insurance Company v. Ogden.

case. I think, therefore, that the judgment is erroneous, and should be reversed ; and that a *venire de novo* should be awarded, to enable the assured to recover his actual damages as for the partial loss only.

By Senator VERPLANCK. There are two distinct heads of examination presented in this case, both of them of great interest to our commerce and navigation.

The first question is, how far does the warranty of seaworthiness of a ship extend ? Or, in other words, in an insurance on time, either for a fixed period, as here, or for a circuitous voyage touching at several ports, or out and home : does this warranty apply or not, as a condition precedent at every successive port, so that any breach of it, after the voyage is begun, vacates the contract, and discharges the underwriter from all subsequent losses, even when not attributable to that particular breach ?

I concur with the decision of the supreme court on this branch of the cause, and hold that the warranty of seaworthiness as a condition on which the whole contract depends, is fully complied with, if the vessel is seaworthy when the risk commences ; that, therefore, the fact of the vessel not having been afterwards properly refitted as to any particular damage, at an intermediate port, does not discharge the insurer from subsequent risk or loss, not consequent on such defect. I need not recapitulate all the cases stated or cited in the arguments before us, or in the opinion of the supreme court. That of *Holdworth* v. *Weir*, 1 *Man. & Ryl.* 671, I think is quite decisive of the English doctrine. It had been strongly contended in that cause, that the warrant of seaworthiness implied seaworthiness at every successive port of a circuitous voyage covered by one policy. The court of king's bench were unanimous in the opinion, " that the warranty did not extend so far as to require seaworthiness at every port from which the ship might depart in the course of the voyage." Among the American cases, that of *Peters* v. *Phœnix Ins. Co.* 3 *Serg. & Rawle*, in the supreme court of Pennsylvania, is especially clear to the same point. The decisions in many other

causes involving this question, are to the same effect, though sometimes with less precision of language in the reasoning of the courts. The whole doctrine established or recognized by the cases is this : Any breach of the condition of seaworthiness at the commencement of the risk, discharges the entire responsibility of the insurer, whether the loss incurred be in any way the consequence of such special defect of seaworthiness or not. It is an obligation *strictissimi juris ;* it goes to the foundation of the contract, and is to be complied with strictly. on both sides ; but when the contract once attaches, it has no further obligation. Any defect of seaworthiness arising afterwards from bad faith, or want of ordinary prudence or diligence in the owner or his agents, discharges the underwriter from liability for any loss occasioned by, or the consequence of, such want of faith, prudence or diligence ; but from no others. It does not affect the contract as to any other risk or loss covered by the insurance, and not caused or increased by such particular defect.

There is, however, a looseness of language in the *dicta* and reasoning of some of the cases on this point, which has led to a corresponding confusion in the books, see 1 *Phil. on Ins.* 117, 2 *id.* 114, 119, and some doubt as to the law. It seems to me to have arisen from confounding the express warranty of seaworthiness at the time of making the insurance, which is the warranty of a *fact* within the knowledge of the assured, with the implied warranty of due diligence, which is the subsequent duty of the assured. The first is a stipulation as to a present fact, always required and understood as a condition precedent, on which the contract depends ; and when that is executed, the contract attaches, and the assured has fully performed that part of his stipulation. But there cannot possibly be an implied warranty of the fact of unbroken and continual seaworthiness, for that would be in contradiction to the very object of the policy, which is to insure against perils and damages, such as must occasionally render the vessel not seaworthy. But there is another implied warranty, beginning when the condition precedent of the

American Insurance Company *v.* Ogden.

*fact* of seaworthiness ends.  It is that of the future discharge, of the assured's *duty* to the insurer, of his good faith, ordinary prudence and due diligence in the management, care and repair of the vessel.  This pervades every part of the law of insurance and every contract formed under it, and the assured takes upon himself the consequences of every breach of such duty.  In the words of Lord Mansfield, 1 *Burr.* 341, "If the chance be varied by the *fault* of the owner, the insurer ceases to be liable, because he is only understood to engage that the thing shall be done free from fortuitous danger, provided due means were used by the trader to attain that end."  When this duty and these "due means" are neglected, and *so far as they are neglected*, the owner discharges the insurer from all the consequences of such neglect, and takes upon himself the risk of every defect of seaworthiness, proceeding from his own or his agent's negligence or misconduct, but no more.  The contract is still good in relation to every point in which he has not, by negligence or misconduct, made the risk his own.  Such is the distinction that I draw from comparison of the numerous cases.  It is, I believe, well settled law, and will be found to harmonize all the *decisions*, though perhaps not all the *dicta* of the courts.  I have gone more fully into the consideration of it, because it has no small bearing on the second question of this case, as well as being decisive of the head now under examination.  To apply this doctrine to the facts of the present case.  The vessel was seaworthy at the beginning of the risk, and the warranty of that fact complied with ; so that the contract of insurance attached.  There was an apparent want of due diligence and ordinary commercial prudence, in not providing an anchor at one of the intermediate ports in place of the one lost ; and this want of diligence, if proved, would have discharged the underwriter, had the loss in question been attributable to the want of the anchor.  But the damages occurred from other causes, with which the having or wanting an anchor had no perceivable connexion.  The contract of insurance, therefore, not having been varied, or the risk increased, as to the particular

peril and loss actually encountered, remains in force, and the insurer is liable for the actual loss.

II. The facts presenting the second question in this cause are these:

The vessel, on her voyage from Norfolk to St. Thomas, a port of her destination, encountered severe weather, and arrived greatly damaged. The cost of repairs necessary to put her in condition for a return voyage was variously estimated, but there was no evidence to show that the damage amounted to half the value of the vessel; and the regular survey estimated the cost of such repairs at about one-third of the sum at which she was valued in the policy. There were no funds whatever to meet this expense in the hands of the consignees or the master, nor could any credit be obtained for the vessel. The whole amount of freight earned by the voyage was absorbed by protested bills for the original outfit from New-York, returned on the master, and the vessel was thus left without either funds or credit for the daily supply of the crew. An attempt was made to raise money on bottomry, which failed. Finally, the master determined to abandon the vessel, and she was accordingly sold. The proceeds of the sale were just sufficient for the payment of the crew's wages, the expenses at St. Thomas, and the master's passage home. There is no doubt of the master's good faith, and of the necessity of the sale; but the question is, whether that necessity (arising, as it did, from want of funds and credit,) is sufficient to authorize an abandonment, and to charge the insurers with a constructive total loss.

On this head I am constrained to differ from the majority of the supreme court, (as well as from the superior court of law of the city of New-York,) and to concur with the dissenting judge, Mr. Justice Bronson, that the judgments below should be reversed.

The doctrine of abandonment for a constructive total loss, as has often been said, is a deviation from the strict contract of indemnity, which is all that the policy bears on the face of it. It ought not, therefore, to be extended by mere inference or impli-

American Insurance Company *v.* Ogden.

cation, to impose any liability beyond what well settled legal decision and known commercial usage have made the necessary though implied conditions of the contract. Commercial usage, as acknowledged, evidenced and explained by judicial decision, has pretty well settled the external circumstances, under which a loss, though partial in itself, shall be deemed total as against the underwriters, so as to authorize an abandonment as part of their contract. Our own peculiar usage authorizes such abandonment, when the damages amount to more than half the value of the vessel. This seems to have been drawn from the old French law, in opposition to that of England, which makes no similar allowance, as well as that of modern continental Europe, which requires a damage of three-fourths of the value. The other grounds of abandonment are well stated by Judge Story, *Peale* v. *The Merchants' Ins. Co.* 3 *Mason*, 65, who, after reviewing all the previous cases, sums up the whole by saying, " If therebe any general principle that pervades and governs the cases, it seems to be this : that the right to abandon exists, when the ship, for all the useful purposes of the voyage, is for the present gone from the control of its owner, and the time when she will be restored to him in a state to resume the voyage is uncertain or unreasonably distant, or the risk and expenses aredis proportioned to the objects of the voyage." To the same effect the law is stated by Chancellor Kent : " It is a constructive loss, if the thing insured, though existing in fact, is lost for any beneficial purpose to the owner." 3 *Kent's Comm.* 318. Here, all the external circumstances give evidence of a case, where the vessel " was lost for any beneficial purpose to the owner ;" and, in Judge Story's words, " for any useful purpose, gone from his control." He had therefore a clear *prima facia* right to aban-don. But, on the other hand, it is equally clear to my mind, that the insurer has a right to look behind that *prima facia* right, just as he has in regard to an actual loss, and to inquire into its cause. To me it seems self evident, that the liability of the underwriter for a constructive total loss must be governed and limited by the same principle with his liabilty for an actual total

loss. If, in the case of an actual loss, he is discharged from liability by tracing the cause of that loss to the negligence of the owner or his agent, why is he not also freed from the responsibility of a constructive or technical total loss, if he can show that the necessity which is the *prima facia* ground of an abandonment, however real, was yet the result of culpable negligence? To both cases, the broad rule so well stated in the simple language of Lord Mansfield, 1 *Burr*. 341, is equally applicable, " the insurer ceases to be liable, because he is only understood to engage that the thing shall be done free from fortuitous danger, provided due means are used by the trader to attain that end." Thus, again, in a more recent leading case, *Tait* v. *Levi,* 14 *East,* 481, where a loss occured by the captain, through ignorance, taking his ship into a wrong port, it was held that this was a failure of the implied warranty that a captain of competent skill should be provided. Lord Ch. J. Ellenborough said, " There was gross negligence in sending a captain so totally ignorant of the coast ;" and this negligence discharged the underwriters from an actual total loss. If, then, gross negligence, or want of due diligence as to any of the warranties, express or implied, of the conditions precedent or subsequent, would have discharged the insurer in this case from the loss actually sustained by perils of the sea—if he could have shown such loss to be the consequence of such negligence—I can see no color of reason why he should not have the same right to inquire into the cause of the necessity, which is claimed as good ground of abandonment ; and if that arose from gross negligence, to free himself from the responsibility for a constructive total loss. On the contrary, it seems to be a necessary consequence of that great and broad principle of our insurance law, which binds the owner to good faith and due diligence, and makes him bear the loss consequent on any neglect of such duty, that the right of abandonment must be forfeited by the same sort of gross negligence as to providing means for the resumption of the voyage, which, in case of an actual partial loss, would have forfeited the right of recovery against the insurers. I infer, then, that if the *absence of funds* or *credit* to enable the

master to repair his vessel in a port of destination, was caused by negligence in the owner, that such negligence forfeits the right to abandon to the insurers.   This is to be distinguished from the doctrine broadly stated and denied by the supreme court, "that the inability to procure funds to repair, or, in other words, the inability to repair the ship, was not a good ground of abandonment."   This I do not maintain.   On the contrary, I can imagine many cases, when even in a port of destination, sudden calamities, war, pestilence, bankruptcy of consignees, or the peculiar character of the place, as in a half civilized country, might exempt an owner from any charge of want of ordinary prudence and diligence, under circumstances otherwise similar to the present.   My position is simply, that an inability, whether to repair or procure funds to repair, arising from such gross negligence of the owner as would have discharged the insurer from any actual loss thence resulting, discharges him also from constructive total loss, and takes away the right of abandonment.   The inference of this rule from the general principle appears to me so close and so necessary, as not to admit of any chain of argument to allow of any further elucidation, or to require any authority. To deny it, is to say that the owner may, by his wrong or negligence, gain an advantage to himself at the expense of his insurer, such as he could not have gained by a strict and faithful compliance with the terms of his contract.   It is to produce perpetual doubt and uncertainty in every similar case, and thus to introduce a new " element of discord," in addition to those which Judge Story has eloquently deplored as already existing in the law of abandonment.

The rule, as I have stated it, is in strict accordance with the principle stated by Phillips, and laid down in *La Guidon de la Mer*, "that the underwriter does not run the risk of the obstructions occasioned by the debts, misconduct, insufficient acquittance, or neglect to pay debts of the assured."   2 *Phil. on Ins.* 179.   It rests on the very same reasons with the decision in one of the most respectable courts of our Union, that when the assured, by mortgaging his ship, deprives himself of the power

of transferring the title, he cannot, by abandoning her, recover against his underwriters for a constructive total loss ; *Gordon* v. *Mass. Ins. Co.* 11 *Pick.* 249 ; where Chief Justice Parker said, " This is one of the cases in which the insured cannot claim a total loss by virtue of an abandonment, because by reason of the transfer, *he had disabled himself from putting the underwriters on the footing which they had a right to expect in case of a loss.*" It rests, too, upon the same ground with that well settled and familiar doctrine, *see* 1 *Phil. on Ins.* 115, *and cases there cited,* that the insurer is not answerable for losses occasioned through the fault of agents employed by the assured ; and the reason assigned by Judge Le Blanc in one of those cases, *Bell* v. *Carstairs,* 14 *East,* 382, applies with equal force to the case of neglect in providing funds or credit. " If a loss happened for the want of that which the assured ought themselves to have provided, it could not have been within the intention of the parties, that the insurer should be liable." The authority is strongly to the point of the present analogous case, and the reason seems to me conclusive as to both classes of neglect.

Such being the general rule, it remains only to inquire what it is that would constitute gross negligence in the ship owner in providing necessary funds, so as to prevent the inability of procuring them from being a valid ground of abandonment ; and how the doctrine applies to the case now before us.

I think we are here warranted in charging the inability to the want of due diligence. I have before stated cases, in which mere inability to raise funds, even in a port of destination, could not be reasonably imputed to any culpable negligence. An unexpected bankruptcy of a consignee, especially if connected with any general prostration of credit, and the necessity of large and expensive repairs beyond ordinary calculations of danger ; the effects of any wide, wasting and general calamity at the port of destination, such as pestilence, or siege, or capture ; these and other contingencies might render that impossible, which, under usual circumstances, would have been but the ordinary arrangement of any prudent merchant. Again : the character of the

port itself must modify the degree of expected diligence. The want of funds which, under the same circumstances, would be wholly inexcusable in a port of the United States, or of Europe, or her colonies, might be a matter of necessity in a port of Cochin China, or the coast of Africa. It is, therefore, difficult to lay down in precise words, any universal rule, as to the duties of an owner and his agents, in providing funds or credit to meet unexpected emergencies, the neglect of which should make him responsible for those losses which otherwise would have fallen elsewhere. Negligence is a relative term, and as is said by the books, in relation to the general doctrine of abandonment, " the right of the parties is to be judged of by the circumstances of each particular case. 3 *Kent's Comm.* 322. But the general principle is clear. The obligation of the ship owner must be the same with that of the *bailee for hire*, or of him who takes charge of goods or property in consequence of some lucrative contract, as they are classed together by Sir William Jones. In consequence of the mutually beneficial contract of insurance, the owner and his agents are intrusted with the interests of the insurer, so far as he may be concerned. But the general rule that governs all such contracts of bailment, and applies to all the analogous cases in the law of shipping and of insurance, makes the party so intrusted chargeable with *ordinary neglect*, which is defined by Sir William Jones as " the omission of that care which every man of common prudence takes of his own concerns," *Law of Bailment*, 118 ; or to take the rule of our American commentator, who has analyzed the same subject with still greater legal learning and not inferior talent, he must exercise " that common prudence which men of business and heads of families usually exhibit in affairs interesting to them." *Story's Law of Bailment, p.* 8. The mechanic who, in consequence of a mutually beneficial contract, has under his charge the materials of his employer, the master who in like manner has control of the property of his owner, and the owner who has confided to him the interests of his insurer, must alike exercise a care, diligence and skill, adequate to the business, for the neglect of which they are all responsible, whilst they are not

answerable for slight neglect or mistake, or for loss by an inevitable accident.   Now, what is ordinary diligence, or duty in respect to the providing funds in a port of destination, has been well defined by Judge Sutherland, in *Van Buren* v. *Wilson*, 9 *Cowen*, 168, " It is the duty of the owners to furnish the master of a vessel with the means of obtaining all the credit which the exigencies of a voyage may require."   And on this ground the court in that case decided that the wages of seamen, which depend commonly on the earning of freight, and are lost when the freight is lost by disaster, can be recovered against the owner when freight is lost by his neglect ; under which head of neglect, that of negligence in furnishing his vessel with funds or credit, was there expressly placed.   It is true, as said by the chief justice in this cause, that this was not in an action between the insurer and insured, but in one for wages by seamen against their ship owner.   But the question of the duty and nature of due diligence towards those whose interests depend upon it, is the same in both ; nor can I see any reason whatever to distinguish as to the responsibility incurred.   To regard the law of insurance as standing entirely on its own insulated ground of precedent and authority, uninfluenced by the more general rules of jurisprudence, and unaffected by analogy to other parts of the law of contracts and commerce, is in hostility with its rational and scientific spirit, and in contradiction to the authority of Mansfield and its other illustrious expounders who have claimed for it the merit of being a science formed by deduction from reason and fixed principles ; and not " merely an unconnected series of decrees and ordinances."

What the " ordinary exigencies" of a ship may be, which a ship owner of common prudence would guard against ; and again, what might be the unexpected circumstances or contingencies that would excuse the want of funds or credit to meet the exigencies, must, as in innumerable cases arising under the law of bailment, of shipping, and of insurance, be judged of according to the case.   The standard of seaworthiness itself varies according to the voyage or the time.   Judge Story, in laying down the

American Insurance Company *v*. Ogden.

general rules of responsibility for due diligence in bailment, (which must also govern this special and peculiar sort of trust or bailment,) with all the lights, not only of profound learning, but of long judicial experience, is content to say that " diligence and negligence must be judged of by the habits of business, usages of society, and the customs of trade." Still, here, (as Judge Story says, regarding the more general rule,) the decision "may vary as to facts, but is uniform as to principle." It is culpable negligence to neglect the means of funds or credit in a port of destination, such as any ship owner of the commonest prudence would have used in the ordinary course of the same business. More than this cannot be demanded. It cannot be expected, for instance, in an adventurous and extensive trade, such as that carried on from our ports, that in a circuitous voyage, there should be provided funds or credit, secured in every port at which she may touch, to the amount of one-half the value of the vessel, to meet every possible exigency. On the other side, it seems to ask no more than the discharge of ordinary duty to the owner and all who are interested, and of ordinary good faith to the underwriters, if it should be required that the vessel, unless other funds were provided, should be unincumbered with previous hypothecation or other debts ; that the freight earned should be free to meet all the wages and expenses legally chargeable upon it, and that the vessel should not be discredited in the eyes of her consignees and of those to whom resort for loans might be made, as to all future risks, by the general negligence as to the present one. As the master, in ordinary circumstances, carries with him in the vessel itself, a fund to meet unexpected difficulties, by his authority to raise money on her by sale or bottomry in case of necessity, that fund of last resort reserved for special exigencies, should not be discredited, or impaired by debts for wages or for ordinary expenses for which the freight is answerable, or for previous debts that ought to be discharged out of other funds. If the owner neglects this, our decisions will make him answerable to the seamen for wages ; and on the same ground he must lose the right of abandonment for a necessity so caused, and look to

his insurer only for the actual partial loss. Between the two cases just stated, there may be many degrees ; but these must be judged of as they occur, according to the case itself.

In the present case, however, there was no appearance of any sort of care, foresight, or diligence in relation to the subject. The master was not supplied, at any of the intermediate ports of lading, with the means of meeting the ordinary expenses of his voyage. He had no funds at any of them, and was even unable to obtain an advance of ten dollars from his consignee at one of these ports. The freight at St. Thomas, (a port of destination,) which was the natural fund for the payment of ordinary expenses and of wages, was exhausted by protested bills for the original outfit, which had been sent out from New-York. Every thing in the management of the business indicated negligence, and tended to impair that credit, which, had the ordinary expenses been met by the earned freight in the usual way, might perhaps have been obtained. It was a case not of ordinary, but of gross negligence ; there was an entire want of diligence, the natural consequence of which was a total inability to procure funds or credit for repairing the vessel.

Upon the whole view of the case, I come to the following conclusion :

1. That the vessel having been seaworthy at the commencement of the risk, any subsequently occurring defect of seaworthiness, does not discharge the insurers from any loss or damage not ascribable to want of due diligence, but they are liable for any loss not caused or increased by or in consequence of such negligence.

2. The broadly stated doctrine, " that the want of funds wherewith to make repairs, is a valid ground of abandonment," is not correct as a universal rule, but does apply to all cases where such want is chargeable to the defect of ordinary diligence or good faith, on the part of the assured or his agents.

3. The particular circumstances of the case showing a total want of ordinary care and prudence, in relation to funds or credit, the inability to provide such funds or credit to repair the

vessel did not authorize an abandonment so as to charge the underwriters, however necessary or proper the sale of the vessel by the master might have been in regard to other interests; and that therefore the charge of the learned chief justice, " that the inability of the master to procure funds at St. Thomas was a valid ground of abandonment," was incorrect.

I am accordingly of opinion that the judgments of the courts below should be reversed, on the grounds last stated.

By Senator WAGER. It is contended on the part of the plaintiffs in error, that the judgment below ought to be reversed, principally for two reasons: 1. Because the warranty of seaworthiness extending to the whole contract of insurance, it attached as a condition at *Charleston* and *Norfolk;* and was broken by sailing from those two ports without a small bower anchor which was lost on the bar off Charleston, thus leaving the vessel as was admitted on the trial, unseaworthy; and 2. Because the inability of the master at St. Thomas to procure the necessary funds with which to repair the vessel, was not a valid cause of abandonment.

In relation to the first point, I mainly concur with the majority of the court who pronounced the judgment below. The implied warranty of seaworthiness attaches as a condition at the commencement of the risk, and not at *every port* at which the vessel puts in during her voyage. If she be seaworthy at the commencement of her voyage, the implied warranty is answered. *Hughes on Ins.* 272. The cases examined by me in relation to the warranty of *seaworthiness*, are all cases of insurance for a particular voyage. As the case on argument is an insurance upon *time*, during which the vessel might perform two or more principal voyages, I was at first inclined to the opinion that a difference would be found in the books in relation to its application to the different policies. I supposed that the same rule which raised an implied warranty of seaworthiness as a condition to a policy for a particular voyage, would annex it also as a condition at the ports of departure of every principal voyage,

American Insurance Company *v.* Ogden.

performed during a policy upon time ; and it does seem to me that such an application of the rule would promote the ends of justice, but as I have not been able to find any such application of it in the books, and as it is unnecessary to decide the point, in coming to a conclusion to reverse this judgment, I forbear expressing a decided opinion upon it. Where the insurance is for a particular voyage, a breach of the condition avoids the whole policy ; not so an omission of the insured, to keep the subject insured in a constant state of seaworthiness during the whole period of insurance. *Paddock* v. *The Franklin Ins. Co.* 11 *Pick.* 227. It is most undoubtedly the duty of the assured, to use all reasonable diligence to keep the vessel insured seaworthy during the voyage, and if she be lost in consequence of this omission of duty, the underwriters will not be held liable.

In the case under consideration, the vessel was not damaged in consequence of the want of her small bower anchor lost at Charleston. She was injured while at sea, and far from any port, where her anchors could have been useful to her. It is clear, therefore, that had the utmost diligence been used at Charleston and Norfolk, to supply the loss which had happened to her on the Charleston bar, it would not have obviated the dangers and damage to which she was subsequently exposed. If the injury sustained by this vessel had happened from want of anchors, I am far from believing that the evidence produced on the part of the plaintiffs below was sufficient to excuse the master from supplying the loss. The anchor was lost on entering the harbor at Charleston, where the vessel lay some five days, without any effort on the part of the master to supply it, save the understanding between him and the pilot, that he should endeavor to find it on the bar and raise it, for which he was to give him $10. He saw the pilot on the morning on which he sailed, and then knew that the anchor was not raised. He nevertheless sailed out of port in the vain hope, that it would be fished up that morning and restored to him on his way out. He had no funds with which to purchase an anchor at Charleston ; the owners had not supplied him with any with which to defray his

necessary expenses; he had no credit. How then could he be expected to replace the anchor? All this omission therefore to use due diligence, would be properly chargeable to the assured and the consequences visited upon them. At Norfolk the master used some exertion to procure an anchor, though he did not there conduct himself as a person would who had the ability, and desired to repair the defect in his ship.

The question of negligence on the part of the master was purely a question of fact for the jury, and had they been permitted to pass upon it without erroneous instructions from the court, their finding would have settled the point. But the court, in charging upon this point, took from them the question of negligence at *Charleston*, by instructing them that the material question was, whether the master made use of due diligence at *Norfolk* to obtain an anchor. Upon this point I think the court erred, and the judgment should for that reason be reversed, had the loss in this case taken place in consequence of the want of the anchor; but as this point is obviated by the rule above adverted to, it was perhaps unnesessary to say what has been said in relation to it. I shall therefore confine the further remarks I have to make, to the second point raised by the plaintiffs.

It may be difficult to conjecture what the verdict would have been, had the cause of abandonment been properly submitted to the jury. They would possibly have been justified in finding, under the circumstances proved, that it came within the rule laid down by Justice Story, in 3 *Mason*, 65: " That the right to abandon exists wherever, from the circumstances of the case, the ship for all the useful purposes of a ship for the voyage, is for the present gone from the control of the owner, and the time when she will be restored to him in a state to resume the voyage is uncertain or unreasonably distant, or the risk and expenses are disproportionate to the expected benefits and objects of the voyage." But as this case was presented to them, they were precluded from inquiring iinto and determining upon the causes of abandonment which existed in the case. They were instructed that the inability of the master to procure funds at St. Thomas,

with which to repair the loss, was a valid ground of abandonment. The rule was laid down so that the jury could not disregard it, though it should appear that the materials and means to repair might be easily had, and the work expeditiously done at a moderate cost, as compared with the value of the vessel. The verdict of the jury upon this point rested, under the charge of the judge, upon the sole ground of the inability of the master to raise the necessary funds to defray the expense of repairing. The majority of the supreme court, erroneously, I think, seem to regard the inability of the master to procure funds, as equivalent to a *general inability* on his part to make the necessary repairs in that port. If this were so, the abandonment would have been justified, under the several decisions on which the court relied. But an examination of those decisions will show, that the vessels abandoned were so situated, that the difficulty and almost impossibility of repairing within a reasonable time, so as to enable the assured to prosecute the voyage, rendered it expedient for the interests of the parties concerned, that the master should exercise his control over the ship, and abandon and sell her. Can it be said, or could the jury have found in this case, had the question been fairly presented to them, that if the master had possessed that credit and ability to raise funds to repair partial losses, which every prudent and discreet owner is bound by a due regard for his own interests, to see that those who act for him possess, in a port of destination, where her cargo is to be discharged, and where ordinarily the freight is to be paid, that the vessel could not have been repaired and put in a complete and seaworthy condition in a reasonably short period, and within the expense estimated by the surveyors at St. Thomas, which did not exceed one-third part of the value of the ship? The testimony shows that the vessel was hove out only about twelve hours at St. Thomas, which was all that was necessary to repair her bottom. The other repairs, though more expensive, were all easily accomplished. But it is unnecessary to discuss this point further, as the jury were not permitted to pass upon it. The cause turned

American Insurance Company *v.* Ogden.

solely upon the inability of the master to procure funds for reparation.

Chief Justice Savage, in the opinion delivered by him, supposes that the omission of the defendants below to put any question to the jury on the subject, is an admission of the good faith and necessity of the transaction, by which the master abandoned and sold the ship. Now I do not so understand the case, as it is presented to us. The jury supposed the necessity of abandonment grew solely out of the inability of the master to procure the necessary funds to defray the expenses of repairs, and that independent of that, there were no circumstances in the case which would enable the assured to turn a partial into a total loss. The second point presented by the defendant's counsel is in these words: " That plaintiffs were not entitled to recover a total loss, inasmuch as the expenses of repairs at St. Thomas, making the usual deductions, would not have exceeded a moiety of the valuation in the policy ; and that the inability of the master to procure funds was not, under the circumstances, a valid cause of abandonment." They also requested the judge to charge the jury, " That St. Thomas being the port of destination, the inability of the master there to procure the necessary funds for repairing the vessel, supposing such inability to be proved, was not a sufficient ground of abandonment." These two positions show that the counsel for the defendants below understood that the only important question upon this point was that growing out of the inability of the master to procure funds.

As between the master and the owners, the sale of the vessel would have been perfectly justifiable ; because it was the duty of the owners to see that the master had credit or means to keep the vessel in a navigable condition. But for this reason, to convert the master into an agent for the insurers, and by his act turn a partial into a total loss, would be extending the rule of abandonment much further than I think any of the cases have gone. It would, in my opinion, be dangerous in the extreme, and open the door to innumerable frauds upon insurers. Almost.

any partial loss might thus be converted into a total one. The inability to procure funds in a foreign port is an excuse, which might easily be framed, aided, as would be the master in framing it, by the avarice of those who might supply the funds, but who refuse a loan with a view to speculate upon the abandoned vessel.

The doctrine of abandonment for a technical total loss, having been engrafted upon the contract of insurance by a course of decisions, is now the law of the land, and those who come within the rule which led to its introduction, are entitled to partake of its fruits. But as it was introduced with doubt, and as the policy of it has since been much questioned, we are bound to see that it be not extended so as to produce injustice. The rule as laid down in this case by the judge who presided at the trial, would afford an entirely new ground of abandonment from any that can be found in the books, and would be dangerous as tending to frauds. I am therefore, for reversing the judgment below.

On the question being put, *Shall this judgment be reversed ?* all the members of the court, with one exception, voted in the *affirmative.*

Whereupon the judgment of the supreme court was accordingly REVERSED.