Marshall, Ch. J.,
 

 after stating the facts of the case, delivered the opinion of the court, as follows, viz:—
 

 It has been decided in this court, that during the existence of such a detention as amounts to a technical total loss, the assured may abandon ; but it has also been decided, that the state of the fact must concur with the state of information, to make this abandonment effectual. The technical total loss, therefore, occasioned by the capture and detention at Mole St. Nicholas, must have existed in point of fact, in December, when this abandonment was tendered, or the plaintiff cannot succeed in this action. Previous to that time, the vessel had been restored to the master ; all actual restraint had been taken off; and it does not appear that her ability to prosecute her voyage was in any degree impaired. But her cargo had been taken by Monsieur de Noailles, the commandant at Mole St. Nicholas, and had not been paid for. The restoration of the vessel, without the cargo, is said not to terminate the technical total loss of the vessel.
 

 The policy is upon the vessel alone, and contains no allusion to the cargo. Had she sailed in ballast, that circumstance would not have affected the policy. The *underwriters insure against the loss or any damage to the vessel, not against the loss or any damage to the cargo. They *- insure her ability to perform her voyage, not that she shall perform it. If in such a case, a partial damage had been sustained by the cargo, no person would have considered the underwriters as liable for that partial damage ; why, then, are they responsible for the total destruction of the cargo ? It is said, that by taking out the cargo, the voyage is broken up. But the voyage of the vessel is not broken up ; nor is the mercantile adventure destroyed, from any default in the vessel. By this construction, the underwriter of the vessel, who undertakes for the vessel only, is connected with the cai’go, and made to undertake that the cargo shall reach the port of destination, in a condition to answer the purposes of the assured. Yet, of the cargo, he knows nothing, nor does he make any inquiry respecting it.
 

 If it be true, that the technical total loss was not terminated, until the cargo was paid for, because the voyage was broken up, then the underwriters would have been compellable to pay the amount of the policy, although the vessel had returned in safety to the United States. To prosecute the voyage, it is said, had become useless, and therefore, the engagement of the underwriters was forfeited, although this state of things was not produced by any fault of the vessel. If this be true, it would not be less true, if, instead of proceeding to Cape Frangois, the Henry and John had returned from Mole St. Nicholas to the port of Charleston. The contract, then, instead of being an insurance on the ability of the ship to perform her voyage, an insurance against the loss of the ship upon the voyage, would be a contract to purchase the vessel at the sum mentioned in the policy, if circumstances, not produced by any fault or disability in the vessel, should induce the master or the assured to discontinue the voyage, after it had been undertaken.
 

 This is termed pushing a principle to an absurdity, and therefore, no test of the truth of the principle. But if it be a case which would occur as fre
 
 *224
 
 M quently as that which has occurred, and if the result which has been ^stated flows inevitably from the principle insisted on, the ease supposed merely presents that principle in its true point of view, deprived of the advantages it derives from its being adapted to the particular and single case under argument. Either the technical total loss of the ship did, or did not, terminate, when she was restored to the master uninjured, and as capable of prosecuting her voyage as when she sailed from the port of Charleston. If it was then terminated, this action cannot be sustained. If it was not then terminated, on what circumstance did its continuance depend ? At one time it is said to depend on the ability or inability of the owner to employ her to advantage. But this position requires a very slight examination, to be discarded entirely. So far as respected the vessel herself, and her crew, she was as capable of being employed to advantage as she had ever been. Only the funds were wanted to enable her to purchase a return-cargo on the spot, or to proceed to her port of destination, and there purchase one. Or she might have have returned immediately to the United States, and if any direct loss to the vessel was sustained, by being turned out of her way, that, after restoration, would be a partial, not a total loss. Besides, what
 
 dictum
 
 in the books will authorize this position ? And what rule is afforded to ascertain the degree of inconvenience which, when, in point of fact, the vessel is in safety, in full possession of the master, and capable of prosecuting her voyage, shall warrant an abandonment ?
 

 No total loss of the vessel, then, existed, after her restoration, so far as that total loss depended on the incapacity of the owner to employ his vessel to advantage. If the total loss continued, after the restoration, that continuance was produced singly by the non-payment for the cargo, which is said to have broken up the voyage. If, then, the vessel had returned to a port in the United States, the voyage would still have been broken up, and the right to abandon would have been the same, as it was while she was on the ocean, in full possession of her master.
 

 *But it is apparent, that the master had terminated the voyage on which the vessel was insured. Had his contract with De Noailles been complied with, at Mole St. Nicholas, or at Cape Frangois, he would not have proceeded to the Bite of Leogane. Had it not been complied with, he would have had no more inducement to go to a port in the Bite of Leogane from Cape Frangois, than from Mole St. Nicholas. The voyage to Port Republican, then, which was the voyage insured, was completely terminated at Mole St. Nicholas ; the voyage to Cape Frangois, in making which she was captured, was a new voyage, undertaken, not for the benefit of the underwriters of the vessel, but for the benefit of the owners and underwriters of the cargo. Consequently, so far as respects the underwriters of the vessel, who insured only the voyage to the Bite of Leogane, the capture at Cape Frangois is an immaterial circumstance, and the technical total loss produced by carrying the vessel into Mole St. Nicholas, was either terminated when she was restored, without her cargo, or would have continued, had she returned to an American port, without her cargo.
 

 Upon principle, then, independent of authority, it is very clear, that the underwriter of the vessel does not undertake for the cargo, but engages only for the ability of the vessel to perform her voyage, and to bear any damage which the vessel may sustain in making that voyage.
 

 
 *225
 
 But it is contended, that adjudged cases have settled this question otherwise. The case has frequently occurred, and a direct decision might be expected on it, if a construction so foreign from the contract had really been made. It often happens, that the cargo of a neutral vessel is condemned as enemy property, and the vessel itself is discharged. Not an instance is recollected, in which the right to abandon in such a case, after the vessel was restored, has been claimed. Yet, if the loss of the cargo amounted to a destruction of the voyage, so far as respected the vessel, and thereby created a total loss of the vessel *herself, notwithstanding her restoration to .. the master uninjured, and in a full capacity to prosecute her voyage, L
 
 ‘
 
 such claims would be frequently asserted, and vessels would be valued high in the policy, for the purpose of selling them on a contingency which so often occurs. It would be strange, indeed, to admit, that if this cargo had been condemned in Mole St. Nicholas, and the vessel had been liberated, the right to abandon would not have been produced by the loss of the cargo, and yet to contend, that non-payment for the cargo does produce that right.
 

 In recurring to precedent, no direct decision by a court on the point, no direct affirmance of the principle, has been adduced ; but the counsel for the plaintiff relies on general
 
 dicta
 
 in the books which are used in reference to other principles. Thus, in 1 T. R. 191, Judge Buller says, “It is an assurance on the ship for the voyage : if either the ship or the voyage be lost, it is a total loss.” In that case, the counsel for the plaintiff contended, that the insurance was on the ship, and on the voyage, and insisted, that as the vessel returned, unfit for use, it was a total loss. The counsel for the defendants was stopped, and Judge Buller said, “ Allowing total loss to be a technical expression, the manner in which the plaintiff’s counsel have stated it, is rather too broad.” Why too broad ? Judge Buller answers, “ It has been said, that the insurance must be taken to be on the ship as well as on thé'voyage, but the true way of considering it is this j it is an insurance on the ship for the voyage. If either the ship or the voyage be lost, that is a total loss.”
 

 In what consists the difference between an insurance on the ship and the voyage, which is laying down the principle too broad, and an insurance on the ship for the voyage, which is the true way of considering it ? If the destruction of the voyage, by the loss of the cargo, is a loss of the ship, then it is an insurance on the ship and the voyage. But this, according to Judge Buller, is not the true principle. The true principle is, that “ it is an insurance on the ship for the voyage,” *that is, that the voyage shall r*gy8 not be destroyed by the fault of the ship, or, in other words, that the ship shall be capable of making her voyage. And when he says, that if either be lost, it is a total loss, he must be understood to mean, if the voyage be lost by the happening to the ship of any of the perils insured against. To understand Judge Buller otherwise, would be to make him inconsistent with himself ; to illustrate a proposition by cases incompatible with that proposition; and to support a distinction by cases which confound the principles intended to be distinguished from each other. But these expressions are used in a case in which the whole contest respected the damage actually sustained by the ship insured, and must be understood in reference to such a ease.
 

 So, in 1 T. R. 615,
 
 Mitchell
 
 v.
 
 Edie,
 
 Buller, J., says, “A total loss is of
 
 *226
 
 two sorts. One, where, in fact, the whole of the property perishes ” (that is, the property insured); “ the other, where the property exists, but the voyage is lost, or the expence of pursuing it exceeds the benefit arising from it.” This was a case in which the cargo, which was the thing insured, was, by one of the perils insured against, prevented from reaching its destined port, and was greatly damaged. The expressions must be explained by the case, for the case itself is in view when the expressions are used.
 

 A
 
 dictum
 
 of Judge Buller, in 1 T. R. 310, is more applicable to this case than either of those before quoted. He says,
 
 “
 
 if the ship had arrived, and the goods had been lost, the assured could not have recovered.” That was an insurance on the arrival of the ship. It is said, that
 
 dictum
 
 was founded on its being a wagering policy; but it appears to be a construction of the terms of the policy. He proceeds to say, that “ in policies on interest, if the voyage be lost, it is not necessary to proceed on with the hulk of the ship.” But to what case does this apply? To an insurance on goods or on the ship ? To a loss of the voyage, by default of the thing insured and abandoned, or by default of the thing not insured? The
 
 dictum
 
 is too *3'79l vaSue an<^ t°° unsatisfactory to form the basis of a great *legal J principle, of infinite importance in commercial transactions. If that case be read throughout,
 
 dicta
 
 may be found interspersed through.it, which militate against the doctrine this single sentence is supposed to support.
 

 In the case of
 
 Goss
 
 v. Withers, there were two policies, one on the ship and the other on the cargo. The language of Lord Mansfield in delivering the opinion of the court with respect to the ship, does not even insinuate the idea that any damage sustained by the cargo would have affected the policy on the ship. In deciding on the claim for the cargo, his language is to be considered with reference to the case itself. It does not appear, whether, in the passage quoted from Le Guidon, the author of that work was treating of an abandonment as to the ship or cargo, or both. Nor does it in any degree tend to establish the principle contended for, that after stating the actual total loss of the goods, Lord Mansfield mentions, as an additional circumstance, showing the complete destruction of the voyage, that the ship was lost also.
 

 In the case of
 
 Hamilton
 
 v.
 
 Mendes,
 
 neither the ship nor cargo was lost. Lord Mansfield puts cases in which there might be a total loss, but those cases are not stated with such precision as to throw any light on the present question. He says, it does not absolutely follow, that, because there is a re-capture, the loss ceases to be total. “ If the voyage is absolutely lost, or not worth pursuing,” and in many other instances, the owner may disentangle himself, and abandon, notwithstanding there has been a re-capture. It is extremely dangerous, to take general
 
 dicta
 
 upon supposed cases, not considered in all their bearings, and at best, inexplicitly stated, as establishing important law principle. Let the
 
 dictum
 
 in the present case be examined. Suppose, the ship and cargo to be owned by different persons, and insured by different underwriters. If the voyage be lost, by the infirmity of the ship, the abandonment might unquestionably be made. If the goods be *3801 damaged or injured, so as to occasion a technical *total loss, so as to J render the voyage not worth pursuing, the owner of the cargo may abandon ; but how does this render the voyage not worth pursuing by the owner of the vessel ? The value of the cargo does not affect him, nor injure
 
 *227
 
 the vessel. With respect to him, the voyage is not destroyed. These
 
 dicta
 
 of Lord Mansfield are uttered in terms which demonstrate that no case like the present was in his view at the time, and they are not adapted to such a case.
 

 The cases from Weskett are upon a peculiar kind of policy. They are in the nature of wager policies, and the nature of the undertaking is said to be, that the ship shall perform her voyage in a reasonable time. “ In these two last kinds of policies,” says Weskett,
 
 “
 
 valued free from average,” and
 
 “
 
 interest or no interest, it is manifest, that the performance of the voyage or adventure, in a reasonable time and manner, and not the bare existence of the ship and cargo, is the object of the insurance.” This remark applies only to policies of the particular specified description; and even with respect to them, it would not appear that the fate of the ship depended on that of the cargo. In illustration of this principle, he states the case of
 
 The Ludlow Castle,
 
 insured from Jamaica to England. She was compelled by one of the perils insured against, to put into Antigua, where she was stopped from proceeding on her voyage, and her cargo was sent to England in another vessel. At the time of the abandonment, and even at the time of the trial, the vessel had not arrived in England, and was not restored to the owner. In this case, the voyage was lost by the inability of the vessel to prosecute it.
 

 The case of
 
 The Sarah Galley
 
 bears a much stronger resemblance to that under consideration, but is not so fully stated as to give the court all its circumstances. It does not precisely appear, what damage was sustained by the seizure at Gibraltar, nor what effect that loss might have on the jury. Nor are we informed, at what time, and for what cause, the abandonment was made. But the great objection to that case is, that it was the verdict of a jury, not the solemn decision of a court, * which verdict was ren- pgg-^ dered at a time when the law of insurance was not settled, and most L probably on a point which has since been overruled in England and in this country. The loss of the ship, on a voyage from Gibraltar to Dunkirk, could not be the fact on which the plaintiff recovered, because that was a voyage not within the policy. The seizure at Gibraltar was the fact on which the jury founded their verdict. The defendant contended, that this total loss was terminated, by the restoration of the ship"; “ yet as the taking at Gibraltar was a taking whereby the return-voyage was prevented, a special jury gave the plaintiff a verdict for a total loss.” The verdict, then, is founded, not on the subsequent actual loss of the vessel, but on the technical loss occasioned by the seizure. This verdict was rendered in the reign of George II. At that time, it was doubtful, whether a technical total loss, occasioned by capture, did not vest in the assured a right to abandon, which right was not divested by restoration. In the case of
 
 Hamilton
 
 v.
 
 Mendes,
 
 which came on afterwards, this point was perseveringly maintained at the bar, and settled by the court. Had the case of
 
 The Sarah Galley
 
 been decided, after the case of
 
 Hamilton
 
 v.
 
 Mendes,
 
 a different verdict must have been rendered. But this decision was given exclusively on the circumstances which had befallen the ship, without a view, so far as is stated, to any loss of the cargo, and is considered by Millar (288) as not being law.
 

 The case of
 
 The Anna
 
 turned entirely on the inability of the ship to prosecute her voyage.
 

 The case of
 
 The Dispatch Galley
 
 is a case in which we are not informed
 
 *228
 
 of the amount of loss occasioned by capture and recapture; and is also a case decided before
 
 Hamilton
 
 v.
 
 Mendes,
 
 most obviously upon the principle that the right to abandon, which was vested by the capture, was not divested by the restoration of the vessel. This case serves to show that the verdict in the case of
 
 The Sarah Galley
 
 did not turn on the subsequent loss of the 'vessel, for this vessel was not lost. There is in it no allusion to any influence which the loss of a cargo might have on the insurance of a vessel.
 

 *The principles laid down by Millar do not militate against those which are contained in this opinion. When he speaks of a loss which defeats the voyage, he alludes to a loss which has befallen the thing insured.
 

 The court can find in the books no case which would justify the establishment of the principle, that the loss of the cargo constitutes a technical loss of the véssel, and must, therefore, construe this contract according to its obvious import. It is an insurance on the ship, for the voyage, not an insurance on the ship and the voyage. It is an undertaking for the ability of the ship to prosecute her voyage, and to bear any damage which she may sustain during the voyage, not an undertaking that she shall, in any event, perform the voyage.
 

 It is the unanimous opinion of the court, that the judgment must be affirmed, with costs.
 

 Judgment affirmed.