By the Court.
Duer, J. delivered the opinion of the court, and after stating the material facts of the case, proceeded as follows : Whether, upon these facts, the plaintiff is entitled to recover a total loss upon the vessel, is the first and the most important of the many questions, which these cases involve, and it will be necessary for us to determine. If this question shall be decided in favor of the plaintiff, it has been contended, that his *357 right to recover a total loss upon the cargo and freight, is a necessary consequence; but we think, that there are special circum-. stances that distinguish this case from those in which this consequence has been held to follow. It will be seen, hereafter, that the questions arising upon the cargo and freight policies are, in reality, distinct, and must, therefore, be separately considered.
The right of the plaintiff to recover a total loss upon the vessel, as we understood the arguments of his counsel, is based upon two grounds.
1st. The inability of the master to procure, at Valparaiso, the necessary funds for repairing the vessel, so as to enable her to prosecute her voyage.
2d. The sale of the vessel, which, under the actual circumstances, it is alleged, was necessary, and, consequently, justifiable. We are, therefore, to inquire, whether, upon either of these grounds, the abandonment can be sustained; for, if not, the complaint upon the vessel policies must be dismissed, or there must be a new trial; and, for the purposes of the discussion, we shall assume that the best exertions of the master, and all that the law requires, were used by him, to raise the necessary funds, and that the vessel, notwithstanding the repairs she had received, was incompetent, when sold, without further repairs, to pursue her voyage. We are not, however, to be understood as saying, that these facts are so clearly established by the evidence, that further proof, in relation to each of them, may not, hereafter, be justly required.
1st. Was the mere inability of the master to procure, at Valparaiso, the funds that he needed for repairing the vessel, a justifiable cause for breaking up the voyage?
When a vessel, disabled by the perils of the sea, is in a port of necessity, and it is ascertained that the cost of her repairs, making the usual deduction, will exceed a moiety of her value, the loss, although, in fact, partial, is total by construction of law, and the owner, if he is insured, and in due season elects to abandon, may demand its payment. His right to abandon is then unqualified and absolute. But it is not upon this ground alone that a vessel rendered innavigable by the perils insured against, may be rightfully abandoned, for although the estimated cost of her repairs may be less than half her value, yet if, by the exercise of that diligence, and the use of those means, which the assured and his *358 agents are bound to employ, she cannot be placed in a condition to perform her voyage, it cannot be doubted, that there is a constructive total loss, the payment of which, upon a proper abandonment, may be j ustly claimed. When the impossibility of making the necessary repairs is occasioned by the want of materials and workmen, it is not denied that such is the law; but we consider the law to be just as clearly settled, that it is quite immaterial, whether the impracticability of making repairs, when the vessel is in a port of distress, proceeds from the want of materials and workmen, or .of the necessary funds or credit. It is the existence of the fact,, and the necessity of breaking up the voyage, which it creates, that justify an • abandonment; and such is not only the opinion of text writers, foreign and domestic, of the highest authority,* but in many adjudged cases has been the language of the Court. .(2 Valin, 345, 7; 4 Boulay Paty, 298; 4 Benecke, 241; 2 Arnould, 1081; Tindal, Ch. J. 4 Car. and P. 283; Reid v. Bonham, 3 B. and Bing. 159.)
We cannot, therefore, hesitate to reject the position for which the learned counsel for the defendants contended; namely, that the inability of the master to raise the necessary funds for repairing the vessel, must in all cases be attributed to the negligence of his owner, who is bound to furnish him with all the funds or credit that the possible exigencies of the voyage may require. In our opinion no such duty rests upon the owner. It is not pretended that there is any general usage that creates a duty, that in its operation would be an oppressive tax, and, speaking generally, an unnecessary burden. Nothing, it seems to us, would be more inexpedient and unreasonable than to require that the owner shall supply the master with specie funds, (for in a port of necessity letters of credit would probably be unavailing,) equal m amount to three-fourths of the value of the vessel; that is, sufficient to defray the cost of all repairs, short of a constructive total loss, in any port of distress, however distant and obscure, into which the vessel, by the accidents of the voyage, maybe driven; for such is, in reality, the extent of the obligation that the argument of the defendants, *359 followed to its consequences, would impose. We are convinced that the decision in the Court of Errors, in the case of The American Ins. Co. v. Ogden, (20 Wend. 287,) the authority on which the counsel for the defendants mainly relied, gives no sanction, nor even countenance, to such a doctrine. Not only was the vessel in that case in her port of destination, but there had been a positive misapplication of the funds that ought to have been applied to her repairs; and it was upon these special circumstances that the judgment of the court was manifestly founded. The fullest, and perhaps the ablest, opinion in that case, is that delivered by Mr. Senator Yerplanck; and we entirely concur with him in saying, that, “the broadly stated doctrine, that the want of funds wherewith to make repairs is not a valid cause of abandonment, is not correct as a general rule, but is applicable only to the cases where such want is chargeable to the want of ordinary diligence, or of good faith, on the part of the assured or his agents.” (20 Wend. 314.) The true and sole inquiry, therefore, is, what is the measure of the diligence that, for the purpose of repairing the vessel, when repairs are necessary, the master is bound to exercise? when unprovided with funds, what are the efforts that he ought to make ? what the means he is bound to employ in order to supply the want ? And these questions, to a certain extent, there is no difficulty in answering. If he cannot raise the sums that are needed upon the credit of his owner, or his own, the law not only gives him the power, but makes it his duty, to raise them upon the security of any part, or of the whole, of the property and interests under his control. He may pledge vessel, freight, and cargo, by bottomry, respondentia, or mortgage. (The Gratitudine, 3 Rob. Ad. R. 355; The Jacob, 4 Rob. 245; The Packet, 3 Mass. 255; The Fortitude, 2 Sumn. 348; Reid v. Bonham, 3 Brod. & Bing. 147; American Ins. Co. v. Coster, 3 Paige, 343; Abbot on Ship, p. 2, ch. 2, § 5, p. 150; Story on Agency, § 118; 3 Kent’s Com. 171-3.) And it is only when all these means have been resorted to with proper diligence, and have proved ineffectual, that he is justified in breaking up the voyage, or his owner, if insured, has any title to abandon. But it by no means follows, from what has now been said, that the diligence and efforts of the master, in procuring the means of repair, are in all cases to be limited to the port in which the disabled vessel has found a refuge. Although nei *360 ther the proper materials or workmen are there to be found, or the requisite funds there to be procured, it is by no means a necessary consequence that he may at once abandon the voyage, and sacrifice, by an immediate sale, the property intrusted to his charge. His obligation to repair the vessel, if reparable at an expense of less than half her value, may still subsist, and his failure to perform the duty, operate to discharge the underwriters from all liability, beyond the payment of a partial loss. If, without any prejudicial delay, or increase of expenses, beyond a moiety of the value, the want of materials or workmen could have been supplied from a neighboring port, or the necessary funds have been obtained by a communication with his owner or consignee, the conduct, of the master in breaking up the voyage and selling vessel and cargo, it seems to us, could never be justified, and would furnish no ground for the recovery of a total loss. We select hypothetical cases to illustrate our meaning:
A vessel bound to, and owned in this city, is forced, by stress of weather, into an obscure harbor on the coast of Kew Jersey, or Long Island. She is so far injured that, without some repairs, she cannot leave the harbor, and the means of repairing her cannot there be found. Is the voyage, at once, to be broken up ? the insurers, to be at once charged with a total loss ? or, would it not be the plain duty of the master to communicate to his owners, without delay, the actual condition of the vessel? and equally their duty, by the transportation of materials and workmen, to make, without delay, the necessary repairs, and complete the voyage ? And when no effort is made to perform these duties, can it be believed, that an abandonment would ever be sustained? Or, take the case of a voyage to a foreign port. An American vessel bound to a port in the Baltic, is damaged by the perils of the seas, and seeks a refuge at Oowes. Materials and workmen there abound, but the master is destitute of funds, and in that small port there is no person able, or willing, to advance them. The vessel and cargo are, however, valuable, the cost of repairs moderate, compared with their value, and by resorting to a merchant or banker in London, the necessary funds may certainly and speedily be obtained. Would it not be extravagant to hold that the master, by limiting his efforts to Cowes, and refusing or neglecting to extend them to London, may convert the partial into a *361 total loss ? And would it not be unreasonable to deny that such neglect would be a violation of duty, a breach of trust, upon which a claim for a total loss could never be founded? These supposed cases, it may be said, bear no very close analogy to that which is before us; but they sufficiently show that the right to abandon, when founded merely on the inability of the master to procure the means of repair in a port of necessity, is not, as when founded on the ascertained cost of repairs, unqualified and absolute. They show that the right is subject to such limitations or exceptions, that the propriety of its exercise, it may be truly said, must depend upon the particular circumstances of each case in which the question arises. The principles that ought to govern the decision of the question, it may not be difficult to state; but there is no fixed and invariable rule; nor, it may be added, any controlling precedent; and it is, therefore, from the nature, terms, and reasonable interpretation of the contract of the parties, that the principles which ought to govern us must be derived. Since wager policies are no longer tolerated, a contract of insurance is emphatically and purely a contract of indemnity; and the interests of commerce, and of the public, require that its true character as'such should never be forgotten, and, in all doubtful cases, be strictly maintained. Hence, the breaking up of a voyage ought never to be sanctioned, when it is certain that the ship-owner, if uninsured, would have continued to prosecute it; nor, consequently, the abandonment of a vessel, as innavigable, ever be sustained, when it is certain that the owner, if uninsured, would have elected to repair. When the policy is valued, it may frequently happen that the breaking up of the voyage, if a total loss may be recovered, would be far more advantageous to the ship-owner, than its successful termination. It is plain, that in these cases, there is a direct temptation to dishonesty and fraud; nor can it be doubted, that this is a temptation which it is the duty of a court of justice, as far as possible, to remove. So long as the valuation in the policy is held to be conclusive, it cannot be wholly removed; but its force may be greatly lessened by confining the power of abandonment, within those limits, which the nature and objects'of the contract, the intention of the parties, and the dictates of reason and policy, evidently prescribe.
The true principle upon which the whole doctrine of abandon *362 ment may be said to rest, and by which alone its application, in converting a partial into a total loss, can be justified, is that which, in the leading case of Anderson v. Wallis, (2 M. & Sel. 240,) is stated by Lord Ellenborough, with his accustomed brevity and force. It is, that an abandonment is never to be authorized, except when, at the time, the loss was actually total, or, in the highest degree, probable; and if we analyze the cases that have settled the law, as it now prevails in England, we shall find that it is this principle that runs through, explains, and justifies them all. To select an example from each class of cases. When the vessel insured is captured, there is an actual total loss; but, as she may be recaptured or restored, an abandonment is necessary to warrant its recovery; a title must be vested in the insurers to give them the benefit of the “ spes recuperandi.” But when the vessel is stranded, the question whether the loss shall be deemed partial, or so far total as to warrant an abandonment, will depend upon the nature and extent of the peril in which the vessel is involved, and the probable difficulty, hazard, and expense of attempting to deliver and repair her. When it appears that by proper exertions she might have been gotten off, and have been fully repaired at a moderate cost, the abandonment is void, and a partial loss only can be recovered; and to warrant the recovery of a total loss, it must be proved that the delivery of the vessel from the peril was, upon reasonable grounds, judged to be impracticable, or not fo be effected, unless at an expense that would absorb her value. In other words, it must be proved that a loss actually total, although not then existing, was in the highest degree probable. (Fontaine v. Phoenix Ins. Co., 11 Johns. 295; The Sarah Ann, 2 Sumner, 255.) We shall not deny that in the United States we have departed widely from the sound doctrine of abandonment, by extending to the vessel that moiety rule which, in its original application, was confined to the goods, and which, thus confined, had itself no other foundation than the existing probability of an eventual total loss; but although an error, which has proved a most fruitful source of litigation, and has broken up, at the expense of the underwriters, numerous voyages, that, uninsured, would have been completed, has become a part of our established law, we cannot see, that this affords any reason whatever for departing from the general law of insurance in cases, which the moiety rule, as ex *363 tended and expounded by our courts, has failed to embrace. We do not believe that constructive total losses, as giving a right to abandon, ought to be multiplied by any further violation of the principle by which alone their introduction into the contract of insurance can be defended or explained. We must, therefore, hold that in all cases of damage or disaster to the ship from the perils insured against, other than the cases to which the moiety rule may with certainty be applied, the question, whether the vessel was justifiably abandoned and sold, or ought to have been repaired, must be determined by a reply to the inquiry, whether the condition of the vessel was such as to justify the belief that all efforts for enabling her to resume the voyage would be fruitless, or that the delay, difficulties, and expenses attending them would be such, that a total loss was a highly probable result. We do not say that it is necessary that the inquiry be made in the exact form that has now been stated. On the contrary, we approve, and would adopt in preference, that mode of submitting the question which for many years has prevailed in England, and which, in the case of Irving v. Manning, the most recent that we have found, was expressly sanctioned by the court of last resort. The question which, according to this decision and many which preceded it, the jury should be required to answer, and upon their answer to which their verdict will depend, is whether a prudent owner, if on the spot, and uninsured, in the exercise of a sound judgment, would have broken up the voyage and sold the ship, or have elected to repair? (Irving v. Manning, 1 H. of L. Cases, 78; Somners v. Sugrue, 4 Carr. & Payne, 284; Doyle v. Dallas, 1 Mood. & Rob. 44; Gardner v. Salvador, 1 id. 116; Donett v. Young, 1 Carr. & Marsh. 465; 2 Arnould, 1087, 1093, 1096, 1109,10,11.) Substantially, the question has the same meaning as that of the probability of a future total loss, since it is only when a total loss is believed to exist, or to be highly probable, that a prudent owner, uninsured, would decline to repair.
It follows, from this form of submitting the question, that it is not enough that the jury are satisfied that in the case before them the master acted in good faith, and in the honest belief that the course he followed was the best for the interests of all concerned. In the language of Lord Tenterden, (1 Mood. & R. 54,) the underwriters are not to be held hable, unless the jury are convinced, not *364 only that the judgment of the master was honestly formed, but that, under the circumstances in which he was placed, it was the best and soundest judgment that could have been formed.
It may possibly be said, that in the cases to which I have referred, the cause turned entirely on the question of the validity of the sale of the vessel, as made by the master, and not on that of the right of the assured to abandon; but as it is only when there is a constructive total loss, which justifies the breaking up of the voyage, that the sale of the vessel can be justified as necessary, the questions are in truth identical, nor, when the abandonment has not been made until the sale has taken place, can they be separated.
That in cases of stranding, the course that an owner uninsured, in the exercise of the best judgment, would have followed, furnishes the correct test of the right of the assured to abandon, has been distinctly admitted, both by Mr. Justice Story, (The Sarah Ann, 2 Sum. 215,) and by Chancellor Walworth, (American Ins. do. v. Ogden, 20 Wendell, 302;) and we are not aware that any reason can be given why the test may not, with equal justice, be applied to every case in which an absolute right to abandon is not established by conclusive proof that the cost of repairs would have exceeded half the value; and by limiting its application to such cases that conflict of inconsistent rules, which Chancellor Walworth has deprecated, will be wholly avoided: no such conflict can arise.
Let us now apply the observations that have been made to the case before us.
For aught that appears, the condition of the vessel at Valparaiso, was one of entire safety, and it is proved that the master might have communicated with his owner in this city, by the Panama route, and have received an answer within eighty, at the utmost ninety, days from the date of his letter. We are bound to presume that the plaintiff, upon being informed of the exact-situation of the vessel, and of the inability of the master to make the repairs she needed, could and would have remitted to him the necessary funds, either in bills or by opening a credit in his favor with a house in Valparaiso. Let an additional month be allowed for repairing the vessel, and another, for the time that would have elapsed from the arrival of the vessel at Valparaiso until the *365 failure of the master to raise there the funds that he required. We have thus five months, as the full period that would have elapsed, had the course that has been indicated been followed, from the first arrival of the vessel at Valparaiso, until she would have been fitted, by sufficient repairs, to resume the voyage. And the question, therefore, is, whether the fact that this, or even a greater delay in the resumption of the voyage, must have intervened had the master elected to remain at Valparaiso until he obtained from his owner the funds that he required, created of itself, independent of any other circumstances, a constructive total loss that warranted the master in breaking up the voyage, and justified an abandonment by his owner?
We are satisfied, both upon principle and upon the authorities, that, to this very material question, no other than a negative answer can be given. The mere continuance of a disabled vessel in a port of necessity, where she is in actual safety, and is not exnosed to further perils, furnishes no evidence whatever that, in the event, the partial loss will become total; and it is, doubtless, for this reason that it has been frequently decided, that a suspension of the voyage merely temporary, is, in no case, a valid ground of abandonment of the vessel, nor, unless the goods are perishable, even of the cargo. In the cases of Anderson v. Wallis, (2 M. & Sel. 240,) and Everth v. Smith, (id. 247,) the voyage was suspended by the •detention of the vessel in port for nearly six months, and yet, in each case, the abandonment was held to be void, and a partial loss only to be recoverable. In the case of Bradlie v. The Delaware Insurance Co., (12 Peters, 400,) in which Mr. Justice Story delivered the judgment of the Supreme Court of the United States, the foregoing, and other cases, are carefully reviewed, and the learned Judge, speaking in the name of the court, deduced from them the following, as the true and established doctrine. His language is, that “ the mere retardation of the voyage, by perils insured against, not amounting to, nor producing, a total incapacity of the vessel, eventually, to perform the voyage, cannot, upon principles well established, be admitted to constitute a technical total loss, which will authorize an abandonment.” He adds, that “ a retardation for the purpose of repairing damages from the perils insured against, the damages not exceeding a moiety of the value of the ship, falls directly within the doctrine.”
*366 It is not possible for us to say, that the application of this established doctrine, to the present case, is at all varied, or affected, by the fact, that when the master resolved to sell, instead of repairing the vessel, the voyage, from the sale or damaged condition of the cargo, had ceased to be worth pursuing. In other words, that it was no longer possible that the plaintiff, either as the owner of the vessel or of the cargo, could derive, •from the further prosecution of the voyage, the benefits he had expected. It is true, that, in the time of Lord Mansfield, the loss of the voyage, as the loss of its anticipated profits was termed, in Goss v. Withers, (2 Burr, 683,) Hamilton v. Mendez, (id. 1198,) Milles v. Fletcher, (1 Douglas, 237,) and in many other cases, was held to be a valid and sufficient cause of abandonment, even of a ship; but not only were these cases directly opposed to the prior decision in the House of Lords, in Pole v. Fitzgerald, (Willis’ Rep. 641; S. C. in error, 5 Brown, P. 0.131,) but they have since been expressly overruled by many decisions in the English courts and in our own. The established doctrine now is, that the insurance is not on the voyage, but merely on the ability of the ship to perform the voyage. The meaning of the contract is, not that the voyage, as to its beneficial results, shall not be defeated, but that the vessel shall not be prevented from completing it, by the perils insured against; and, in judgment of law, the vessel is not so prevented, so long as she remains in the possession of the master, and although disabled, may be and ought to be repaired. (Parsons v. Scott, 2 Taunt. 363; Faulkner v. Ritchie, 2 M. & S. 290; Brown v. Smith, 1 Dow. P. C. 359; Naylor v. Taylor, Danson & Lloyd R. 248; Alexander v. Baltimore Ins. Co. 4 Cranch, 370; Huston v. Phoenix Ins. Co. 1 Wash. C. C. R. 400; Ritchie v. Mutual Ins. Co. 12 Peters, 405; 2 Arnould, 1064-1071; 2 Phillips, 3d ed. 255-258.) It is a necessary conclusion, from the remarks we have made and the authorities we have cited, that the delay in the prosecution of the voyage that would have resulted from the detention of the vessel for repairs, even combined with the fact that the objects of the voyage, as a mercantile adventure, were wholly defeated, was insufficient to justify the proceedings of the master, and, consequently, to warrant the claim of the assured for a total loss. Looking to these facts alone, we are clearly of opinion that the case belongs to the class of those in which it has been held that it was the plain duty of the master to have communicated with his *367 owner, before he resolved on breaking up the voyage and selling the ship, and that his neglect, in the performance of this duty, entitled his owners to repudiate his acts; and we agree entirely with Mr. Phillips, that, in such cases, it is a partial loss only that can be recovered from the underwriters. Proceedings that would have been void as against his owners, if uninsured, can never be treated by them, when insured, as valid against the underwriters. (Tanner v. Bennett, 1 R. & M. 182; Scull v. Bridle, 2 Wash. C. C. R. 150; Pierce v. Ocean Ins. Co. 18 Pick. 83, 2 Phillips, 3d ed. p. 307, § 1678; The Fanny and Elmira, Edwards’ Adm. R. 119.)
But although the claim of the plaintiff for a total loss cannot, we think, be sustained upon the evidence now before us, it is possible other circumstances may have existed, which, if proved upon the trial, taken in connection with those that have been proved, would have entitled him to the judgment he demands. It may still be true, that the real state of the facts was such, that the detention of the vessel at Valparaiso, until the master could communicate with his owner and receive his answer, would have rendered a loss actually total, in the highest degree probable. It may be, that from the insecurity of the harbor, the season of the year, the action of worms upon her bottom, or other causes, the vessel, during her necessary detention for repairs would have been exposed to such additional hazards that a prudent owner, uninsured, in the exercise of a sound discretion, would have determined to sell, instead of repairing her. Ho proof in relation to these facts was given upon the trial that has been had; but, as it is alleged that the proof exists, we think it will not be unreasonable to grant a new trial, for the purpose of enabling the plaintiff to produce it, unless upon some other ground his claim for a total loss can be sustained.
2d. The next inquiry, therefore, is, whether the sale of the vessel created, of itself, a total loss, for which the defendants are liable; and we reply that, according to all the authorities, such could not be the effect of the sale, unless it was rendered necessary by the perils insured against, or was in itself an act of barratry. It has been truly said by an eminent Judge, “ that there is no such head of insurance law as a loss by sale.” Bayley, J., (1 Mood. & Rob. 19,) and the meaning is, that unless the facts that precede the sale constitute a constructive total loss, none can arise from the fact of *368 sale, however disastrous in its result to the owner, for which the insurers can be made responsible. In the words of Mr. Arnould, “ the mere fact of a sale, irrespective of the state of the ship which made it necessary, can never give the assured a right to abandon,” (12 Arnould, 1082,) and in those of Mr. Phillips, “ that if the circumstances rendering a sale necessary do not constitute a total loss, a sale by the master will not make it such, unless it is a case of barratry,” (2 Phillips, 305, § 1571, 3d ed.,) and the language of these judicious writers is fully borne out by the cases to which they refer, and which we deem it needless to cite.
The good faith of the master, in the case before us, is undoubted, and hence the sole question is, whether the sale of the vessel, as made by him, was justified by a necessity constituting a constructive total loss. The allegation is, that the creditors, by whom the partial repairs on the vessel had been made or furnished, had acquired a lien which the master was unable to discharge, and which they threatened to enforce, and, consequently, that a sale by the master was necessary to prevent a forced sale by process of law. But, admitting that the facts thus relied on have been sufficiently proved, it is impossible to say that the necessity which they created was a consequence of the perils insured against, since it is manifest that it arose entirely from the voluntary and injudicious acts of the master, in ordering repairs to be made when he was unprovided with funds to defray their cost. Nor is this all: even where a lien for repairs is properly created, its existence furnishes no ground for an abandonment; nor is a partial converted into a total loss, even when the lien is enforced by a sale of the vessel under an admiralty sentence. To prevent a sale, by the discharge of the lien, is the duty of the owner, and the underwriters are not responsible for a loss not attributable to the perils insured against, but exclusively to his neglect, or that of his agents. (Thorlley v. Wilson, 2 B. & Aid. 313; Depau v. Ocean Ins. Co. 5 Cow. 63; Bradley v. Maryland Ins. Co. 12 Peters, 398; Williams v. Suffolk Ins. Co. 3 Sumn. R. 310; Humphrey v. Union Ins. Co. 3 Mass. 429.) We are, therefore, clearly of opinion that, unless the abandonment can be sustained upon grounds wholly independent of the sale of the vessel, and of the supposed necessity by which it is sought to be justified, it is a partial loss only that the plaintiff will be entitled to recover.
*369 3d. The objections that have been urged on the part of the defendants to the recovery, in any event, of a total loss, must next be considered. If these objections, of any of them, are valid, instead of ordering a new trial, the loss, as partial, must he properly adjusted, and a final judgment be rendered for its amount.
There is no weight in the objection, so far as appears from the evidence now before us, that the abandonment was improperly delayed. The plaintiff was not bound to abandon when he first received the intelligence of the arrival of the vessel at Valparaiso. He had, in truth, no right to abandon, until he was informed that the voyage was broken up, and the vessel sold, in consequence of the inability of the master to procure the funds for her necessary repairs. The letter containing this information was probably not received by him until late in the month of December, and we cannot say that his abandonment, on the 8th of January following, was not made in due season. There was no delay by which the defendants could have been prejudiced.
The next objection is, that the right to abandon, if it existed at all, was divested by the sale of the vessel, before the abandonment was made. Where the total loss is claimed, on the sole ground of the innavigability of the ship, the underwriters, it is said, may defeat an abandonment, by electing to make themselves all necessary repairs; and if this be true, it follows, that to enable them to make this election, the abandonment must be made while the vessel still remains in the possession of the assured. It cannot be said that this doctrine,is unreasonable in itself, or is destitute of authority; but, although it seems to have been adopted by the Supreme Court of Massachusetts, it was, in our judgment, decisively rejected by our own Court of Errors, in the leading case of Center v. The American Ins. Co. (7 Cow. 564; S. C. 4 Wendell, 45.) The law, in this state, we consider now settled in conformity to the opinion of Mr. Justice Story, that the right of abandonment is not a shifting right, dependent upon the will of both the parties, but that where it has once rightfully attached, its exercise by the assured, cannot be prevented or defeated by any act or offer on the part of the underwriters. (Peel v. The Merchants' Ins. Co. 3 Mason, 29.)
Nor can we hold, that the right of abandonment, in the present case, was divested by the election of the master to repair. Had *370 the repairs been completed, or so far completed, as to render the Vessel capable of resuming the voyage, such, undoubtedly, would have been the result. (Dickey v. The New York Ins. Co. 4 Cowen, 222; Humphrey v. The Union Ins. Co. 3 Mass. 429; Benson v. Chapman, 6 Man. & Ur. 792.) But as the repairs made were only-partial, and, as we infer from the evidence, left the vessel still unseaworthy, we see no reason to doubt that she was as properly a subject of abandonment, in her actual condition, as if no attempt to repair her had ever been made.
The question, whether the existence of a prior lien, created by a bottomry, is a bar to an abandonment, is not, under the circumstances of the case, necessary to be considered.
If the voyage was rightfully broken up, the sale that followed was plainly justifiable; and if, in the event of the recovery of a total loss, the defendants will be entitled to be credited, as salvage, with the whole proceeds of the sale, deducting only its necessary expenses, it is evident that the mere fact that a bottomry bond had been previously in force, will furnish no ground of complaint. As it appears from the evidence, that the whole of the partial loss that gave rise to the bottomry, has been satisfied by the defendants, it seems a necessary consequence that, if chargeable with a total loss, they will be entitled, on the settlement of its amount, to the credit that has been stated.
The objections, on the part of the defendant, being thus disposed of, we retain the opinion, that the purposes of justice require that, in the actions on the vessel policies, a new trial shall be granted; and we add, that, upon such trial, the right of the plaintiff to recover a total loss, will depend upon the answer that shall be given by the jury to the following question, namely, Whether, when the vessel was sold, the probability that a loss actually total would ensue, should she be detained in port until the necessary funds for her repairs could be procured, and the repairs be made, was such, that a prudent owner, uninsured, in the exercise of a sound judgment, would have decided, instead of repairing the vessel, to relinquish the voyage ?
4th. The questions that arise, upon the cargo and freight policies, will not long detain us.
Even should the right of the plaintiff to recover a total loss upon the vessel be conceded or established, it seems to us evident *371 that, upon the facts now proved and admitted, he cannot be entitled to recover a total loss of the cargo. It is true that the cargo was lost to him by its sale, and that this loss was total, diminished only by the net proceeds of the sale; but the proximate cause of the loss was the sale itself; and this, as it was not an act of barratry, was certainly not a risk covered by the policy; and if a consequence at all of the perils insured against, it was a remote and accidental, not a direct and necessary, consequence. The cargo was not sold on account of its damaged condition, but for the single purpose of raising funds for repairing the vessel; and without a violation of principle, and a disregard of the authorities, we cannot hold that the insurers on the cargo are liable for the loss that resulted. It is not a loss within the terms and spirit of their contract. The law is thus settled by decisions, of which the authority has not been, denied; and we know of no distinction that can exempt the present case from the application of the doctrine that they establish. (Powell v. Gudgeon, 5 M. & Sel. 431; Sarquay v. Wilson, 4 Bing. 131; Moses v. The Sun Mutual Ins. Co. 1 Duer, 159.) It has been said that as the inability of the master to procure the funds that he needed, existed when the vessel arrived at "Valparaiso, the loss was at that time constructively total; that it is to this period, therefore, that the abandonment, when made, must be construed to relate, and that by its retrospective force, the master became, from that time, the agent of the defendants alone,—their agent in the sale of the cargo as well as of the vessel, (2 Phillips, 3d ed. § 1732, p. 1223 ; id. 3d ed. § 1708, and cases cited, pp. 395, 398,) but from this view of the rights and relations of the parties we are forced to dissent. In our opinion, there was no right of abandonment, no constructive total loss, until the master determined to break up the voyage, in consequence of the failure of his efforts to procure the necessary means for its prosecution; until then, the master acted solely as the agent of the plaintiff, with a sole view to the protection of his interests in the completion of the voyage. The sale of the cargo, therefore, as made by him, was, in judgment of law, the act of the plaintiff,—as truly so, as if he had directed it in person.
It has also been contended that, as the vessel was never repaired, and it is proved that no other could have been procured to carry *372 on the cargo to its port of destination, it may justly be considered as having been, in fact, lost from the perils insured against, and the defendants be precluded from setting up its prior sale as a defence, since, in all events, its sale must have been ordered; but upon what principle underwriters can be made liable for a loss that would have happened from a peril insured against, had it not already taken place from a different cause, we are unable, we must confess, to understand. If goods insured free from capture, are seized and taken possession of by the enemy, and the ship that contained them having been released, and suffered to proceed on her voyage, founders at sea, we cannot believe, that an action for the recovery of a total loss could be maintained against the underwriters on the goods, upon the ground that, had they not been taken by the enemy, they would have perished with the ship.
Had a third person been the owner of the cargo, in the case before us, its sale would have given him an immediate right of action, for the recovery of its value, against the plaintiff, as owner of the vessel, and, assuredly, his right of action would not have been divested by the subsequent breaking up of the voyage. Let it be admitted that in the events that have happened, he would have had an election to seek the recovery of his loss in an action against his insurers, or against the plaintiff. In all cases, where such an election is. given to the assured, his insurers, upon payment of the loss, are subrogated to his rights and remedies against the vessel audits owners, (Marsh on Ins. 242 ; 2 Phillips, 419 ; 8 Kent’s Gom. 371 n.;) but where the same person is the owner of both vessel and cargo, as in the case before us, it would be absurd to permit him to recover a loss for which he would himself be immediately liable to the very persons from whom its recovery is sought. To permit a recovery in such a case, would, in the words of Lord Denman, be a scandal, as well as an absurdity; and to avoid a circuity of action that would justify the scandal, such a recovery is never allowed. (Walmsley v. Cooper, 2 Ad. & Ellis, 222; Connop v. Levy, xi. Queen’s Bench R. 760; Turner v. Davies, 2 Williams’ Saunders, 150, note.)
But although the claim of the plaintiff to recover a total loss of the cargo cannot, in our opinion, be admitted, it seems not Improbable that he has sustained, and is entitled to recover, a partial loss of a considerable amount. It appears that the cargo, when unladen at Valparaiso, was found to be greatly damaged, but what *373 was the extent of this damage, and whether it was occasioned by the perils insured against, are questions which are left in uncertainty, and which, as the case now stands, we have neither the means, nor the power, to determine. That they may properly be submitted, to and determined by a jury, there must be a new trial in the actions upon the cargo, as well as upon the vessel policies.
It follows, from the observations that have already been made, that there can be no recovery at all upon the freight policies, and, consequently, that the complaints in these actions must be dismissed. The loss of the freight must be wholly ascribed to the voluntary act of the master, in selling the cargo; and the loss, although total, was no more a consequence of the perils insured against than that of the cargo itself. The freight from Hew York to Valparaiso was necessarily lost by the sale of the goods, from which it was to arise; and there is no evidence, nor is it pretended, that had the vessel been repaired, any freight would have been earned on her voyage from Valparaiso to her port of destination. Hence, it is a total loss that the plaintiff is entitled to recover, if he has any right to recover at all; and as the question of his right is determined against him, it would be idle to grant a new trial that could lead only to the same result, as our present decision.
Hew trial upon vessel and cargo policies, costs to abide event." Complaint upon freight policies dismissed with' costs.

 Pothier (Traité du Con. d’Assur. n. 126) alone expresses doubts, hut his doubts seem .to be founded upon the limited construction given by him to the French Ordinance.