Joseph K. Murray, as Trustee for Mortgage Bondholders of the Steamship *Cleopatra*, Respondent, *v.* The Great Western Insurance Co., Appellant.

*Marine insurance — absolute total loss — constructive total loss — technical total loss — rights of assured — when and by whom a legal abandonment can be effected — reasonable time therefor — evidence — reasonable efforts of the owner of a vessel for its safety, a question for the jury — the question cannot be first raised on appeal — objection as to defective proof of loss — promissory notes of the owners allowed as counterclaims.*

An absolute total loss takes place when the subject insured wholly perishes, or there is a privation of it, and its recovery is hopeless. A constructive total loss takes place when the subject insured is not wholly destroyed, but its destruction is rendered highly probable, or the privation of it, though not quite irretrievable, is such that its recovery is either exceedingly doubtful, or too expensive to be worth the attempt.

An absolute total loss entitles the insured to claim from the underwriter the whole amount of his subscription. A constructive total loss entitles him to make such claim, on condition of giving notice of abandonment of all right and title to any part of the property that may still exist, or that may still be recovered.

In determining whether a ship is so far injured as to become a constructive total loss, its value as stated in the policy controls.

A legal abandonment cannot be effected unless the person who assumes to make it has, at the time of the loss, the power to make a legal transfer of the property abandoned.

An abandonment, to be effectual, must be made within a reasonable time ; but what time is reasonable is a question compounded of fact and law, which has not yet been reduced to such certainty as to enable the court to pronounce upon it without the aid of a jury.

The provision of a marine insurance policy (in which the term "technical total loss" is used), which should be construed to mean a "constructive total loss," considered.

Evidence as to the condition of a vessel which presents a fair question for the jury, so that its verdict as to the vessel's being a total loss should not be disturbed on the ground that it is contrary to the weight of evidence, considered.

In an action brought to recover on a marine policy of insurance by which the defendant insured the *Cleopatra* against perils of the sea for one year, from September 16, 1878, for $9,000, under a policy in which the vessel was valued at $75,000, it was shown that the policy was taken out by and in the name of the owners of the ship.

On the trial the defendant called one Perrets as a witness, who testified that he was interested with a Baltimore firm, in the purchase and sale of the vessel. He also testified as to its condition in February, 1880, when lying at Nassau,

and that he purchased her February 23, 1880, for the Baltimore firm, and as to the amount expended at Nassau in repairs, the amount expended in Baltimore for the same purpose, and that the last he knew of her, she was for sale in Baltimore.

On his cross-examination the plaintiff was permitted to show by him that he paid £220 for the vessel at the auction sale, and that, on December 15, 1880, such firm exchanged the *Cleopatra* for a vessel valued in the trade at $6,000, and for $14,000 in cash and notes.

*Held*, under the circumstances, that on his cross-examination it was competent to show the amount for which the vessel was sold, for the purpose of enabling the jury to judge what weight should be given to the evidence of the witness, bearing upon the value of the ship.

By an indorsement on the policy of insurance, the loss, if any, was made payable to the plaintiff as trustee for certain mortgage bondholders. The vessel was also insured by other underwriters for $38,000. The mortgage was in the ordinary form, and contained in form, an absolute conveyance of the title with a defeasance. It recited that it was made to secure the payment of forty bonds of $500 each, with interest, and that when they were paid the mortgage should be void, and provided that, until default should be made in the payment of the bonds, the mortgagors should be permitted to possess and use the steamship and appurtenances, repair and renew the same, take and use the income thereof, and apply the same to the necessary current expenses and the purchase of necessary machinery and equipments, or dispose of the same for the legal uses of the mortgagors, in any manner not inconsistent with the mortgage, and, in case default should be made in the performance of any of the mortgagors' covenants, that the mortgagee might take possession of the vessel and sell or dispose of the same at public or private sale. The mortgagors covenanted that they would keep the ship insured for at least $25,000, and assign the insurance to the mortgagee as additional security.

*Held*, under the circumstances, that the owners of the ship had the right to transfer the vessel to the insurers, and, therefore, could effect a legal abandonment thereof.

The defendant asked the court to decide as a matter of law, that the abandonment was not made within a reasonable time, but made no request that any question of fact involved in that issue be determined by the jury. The court found against the defendant.

*Held*, that it was not apparent that the question of reasonable time was erroneously determined by the court.

Neither the court nor the jury was asked on the trial to determine the question, whether the plaintiff and the owners used reasonable efforts for the safety of the vessel, either as an issue of fact or of law.

*Held*, that the question presented an issue of fact, which could not be raised for the first time on appeal.

The policy provided that proofs of loss were to be authenticated by the agent of the company, if there should be one at the place where such proofs were taken, and in case of loss, such loss was to be paid thirty days after proof thereof,

and of interest. When the proofs were served, the defendant did not object to them on the ground that they were not authenticated by its agent, nor for any insufficiency in their form, but the claim was disputed by the defendant, on the ground that it was not liable for a constructive total loss.

*Held,* that if the defendant then intended to stand on the defense that the proofs were defective, it should have given notice of the defects claimed, so that they could have been corrected.

The defendant read in evidence three letters written by the owners of the *Cleopatra* to their agent at Nassau, one dated October 31, 1878, one November 2, 1878, and the third November 15, 1878, and also two letters from them to the captain of the *Cleopatra*, one dated October 31, 1878, and the other November 2, 1878. The plaintiff was permitted to read in evidence, over the defendant's objection, two letters from such agent to the owners, one dated October 24, 1878, and the other October 25, 1878, and also a letter from the captain of the *Cleopatra* to them, dated November 5, 1878.

The letters all related to the circumstances of the stranding of the *Cleopatra*, and the extent of the loss, and formed the whole of a connected correspondence between the owners, their agent and the captain of the lost ship.

*Held,* that they were competent evidence.

The defendant alleged in its answer, and proved on the trial as a counterclaim, three promissory notes given by the owners of the *Cleopatra*, to, and held by it. The first was for $301.25, given December 21, 1877, due December 24, 1878, the second for $901.25, given September 16, 1878, due September 19, 1879, the third for $721.25, given November 16, 1878, due November 19, 1879. The first and third notes were given for the premiums on two policies of insurance on other vessels, and the second for the premium on the policy in suit. The policy provided that in case of loss, such loss was to be paid in thirty days after proof of loss and interest, the amount of any note or notes given the company for premiums, if unpaid, and all other indebtedness being first deducted.

On the trial, the plaintiff consented to the deduction of the amount of the note given for the premium on the policy in suit, and it was deducted, but the court refused to allow either of the other notes as a counterclaim.

*Held,* that the first note was due when the action was begun, and it should have been allowed as a counterclaim;

That the third note was not due when the action was begun, and was not a proper counterclaim;

That the amount due on the second note at the time of the trial should have been deducted from the amount due on the policy, as found by the jury.

APPEAL by the defendant, the Great Western Insurance Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the city and county of New York on the 17th day of May, 1892, upon the verdict of a jury rendered at the New York Circuit, and also from an order denying the defendant's motion for a new trial, entered in said clerk's office

on the 2d day of May, 1892, as resettled by an order entered in said clerk's office on the 9th day of May, 1892.

*Treadwell Cleveland*, for the appellant.

*George C. Holt*, for the respondent.

FOLLETT, J. :

This action was brought to recover on a marine policy of insurance by which the defendant insured the *Cleopatra* against perils of the sea for one year, from September 16, 1878, for $9,000, under a policy in which the vessel was valued at $75,000. The policy was taken out by and in the name of the owners of the ship, but by an indorsement, the loss, if any, was made payable to the plaintiff as trustee for certain mortgage bondholders. The vessel was also insured by other underwriters for $38,000.

The *Cleopatra* was a wooden steamship of about 1,045 tons burden, built in 1865. In August, 1878, she was found to be considerably " hogged," both ends being lower than the center, and in that month she was repaired, strengthened and supplied with new boilers. At this time and at the time of the stranding, David Golden Murray, Lindley Murray Ferris, Jr., and Robert M. Ferris, constituting the firm of Murray, Ferris & Co., were the owners of eighty-five one-hundredths, and Sophus Valentine, the master, was the owner of fifteen one-hundredths. To secure the payment of $20,000, the cost of the repairs, Murray, Ferris & Co., September 12, 1878, mortgaged their interest in the ship to Joseph K. Murray, as trustee, to secure the payment of forty bonds of $500 each. The mortgagors stipulated in the mortgage to keep the vessel insured for $25,000 for the benefit of the trustee. There was a prior mortgage of $6,000 on the ship held by Joseph K. Murray, individually, which he stipulated should become the second lien.

After the ship had been so repaired and insured, she made one round voyage between New York and Santiago de Cuba via Nassau and Cienfuegos, without accident, and October 17, 1878, she left New York on a second round voyage between the same ports.

October 23, 1878, the vessel was stranded on a reef in Douglas channel, near Nassau, New Providence, one of the Bahama islands. December 18, 1878, the owners gave the defendant written notice

of the stranding, and that they abandoned the vessel to the insurers, and March 12, 1879, the plaintiff, as trustee, gave a like notice, in which the owners also joined.

It is conceded that the vessel was considerably injured by the accident, and the plaintiff asserts that he and the owners were justified in abandoning her, and that he is entitled to recover for a constructive total loss.

Besides the question of damages, the only issue of fact submitted to the jury (neither party requesting the submission of any other), was whether the vessel was so injured that it became a constructive total loss. This issue has been three times tried; first, at Special Term before Mr. Justice DONOHUE, where a judgment was rendered for the plaintiff; second, before a jury which disagreed, and, lastly, before the jury which rendered the verdict on which this judgment now under review was entered.

The policy provides : " And it is further agreed that in case a total loss shall be claimed for or on account of any damage or charge to the said vessel, the only basis of ascertaining her value shall be her valuation in this policy."

The valuation clause in the policy is as follows :

" Hull and apparel valued at............................. $37,500
" Boilers and machinery................................. 37,500

" Total.................................................. $75,000

" The valuations of hull, tackle and apparel being made separate from that of the boilers and machinery, it is agreed that no abandonment of one interest as valued shall be made unless there shall be a total loss of the other."

It was further provided in the policy : " And, lastly, it is agreed that in case of any claim for loss or damage a deduction of one-third from the cost of repairing, or replacing the same, shall be made after deducting the value of the old materials, except in the case of anchors, and of sheathing of copper and other metal; a deduction of one-fortieth from the expense of repairing or replacing the metal, sheathing or any part thereof (after first deducting the value of the old metal and nails), shall be made for every month since the vessel was last sheathed until the expiration of forty months, after which time the cost of remetalling or repairing the same shall be wholly

borne by the assured. If a technical total loss shall be claimed, similar deductions shall be made from the estimated repairs, and unless the net cost thereof would ,exceed a moiety of the value of the vessel, after making such deduction, the loss shall be deemed partial only."

The term "technical total loss" is used in the policy, which means the same as "constructive total loss." (2 Phil. Ins. 237; 2 Pars. Mar. Law, 336; 2 Pars. Mar. Ins. 110.)

Mr. Arnould, in his learned work on Marine Insurance (vol. 2, 951, 6th ed.), defines the term "constructive total loss" as follows:

"An absolute total loss takes place when the subject insured wholly perishes, or there is a privation of it, and its recovery is hopeless. A constructive total loss takes place when the subject insured is not wholly destroyed, but its destruction is rendered highly probable, or the privation of it, though not quite irretrievable, is such that its recovery is either exceedingly doubtful or too expensive to be worth the attempt.

"An absolute, total loss entitles the assured to claim from the underwriter the whole amount of his subscription. A constructive total loss entitles him to make such claim, on condition of giving notice of abandonment of all right and title to any part of the property that may still exist, or may still be recovered." This definition is approved by the courts and text books. (3 Kent's Com. 318; 2 Phil. Ins. 237; 2 Pars. Mar. Ins. 107, and cases cited.)

The foregoing is the general rule, but in cases of injuries to vessels, and in the absence of stipulations in the policies on the subject, the courts of different jurisdictions do not agree as to the proportion which the cost of repairing must bear to the value of the ship, so as to justify an abandonment and a claim for a constructive total loss. (*Dickey* v. *New York Ins. Co.*, 4 Cow. 222; affd., *Dickey* v. *American Ins. Co.*, 3 Wend. 658; *Saurez* v. *Sun Mutual Ins. Co.*, 2 Sandf. 482; 2 Pars. Mar. Ins. 125 *et seq.*; 2 Arn. Mar. Ins. [6th ed.] 952; *Irving* v. *Manning*, 1 H. L. Cas. 287.) And the courts do not agree, in the absence of stipulations on the subject, whether the valuation in the policy, if the vessel be therein valued, or the value of the ship just before the injury, or its value after reparation, should be taken as the basis in estimating the proportion of the cost of repairs to value. (*American Ins. Co.* v. *Ogden*, 20

Wend. 287; *Wallerstein* v. *Columbia Ins. Co.*, 44 N. Y. 204, 217; *Patapsco Ins. Co.* v. *Southgate*, 5 Pet. 604; *Deblois* v. *Oceanic Ins. Co.*, 16 Pick. 303; *Peele* v. *Merchants' Ins. Co.*, 3 Mason, 27; *Bradlie* v. *Maryland Ins. Co.*, 12 Pet. 378; 3 Kent's Com. 331; 2 Pars. Mar. Ins. 134; 2 Arn. Mar. Ins. [6th ed.] 995, 1046, 1055, 1148.)

In the case at bar it is provided in the policy that a constructive total loss shall not be claimed unless the net cost of repairs, after making the deductions specified in the clause, exceed one-half of the value of the vessel. In this State the rule is that in determining whether a ship is so far injured as to become a constructive total loss its value as stated in the policy controls. (*American Ins. Co.* v. *Ogden, supra*; *Wallerstein* v. *Columbia Ins. Co., supra*; 3 Kent's Com. 331.) This is also the rule in Massachusetts (*Deblois* v. *Oceanic Ins. Co., supra*), and in England. (*Irving* v. *Manning, supra*; 1 Arn. Mar. Ins. [6th ed.] 301.)

The Supreme Court of the United States holds that the actual value of the ship immediately before the accident is to govern. (*Patapsco Ins. Co.* v. *Southgate, supra*; *Bradlie* v. *Maryland Ins. Co., supra*; 3 Kent's Com. 331.)

The learned trial judge instructed the jury in accordance with the rule of this State, which was acquiesced in at the trial by the litigants, and the accuracy of the instruction is not questioned by counsel on this appeal.

Whether the extent of the injuries sustained by the vessel was sufficient to justify its abandonment, within the rule of this State, was a sharply contested issue of fact, which the appellant insists was determined contrary to the weight of evidence.

Two surveys were made of the *Cleopatra* by surveyors appointed by the United States counsel at Nassau. The first one was October 24, 1878, at Cochrane's Anchorage, the day after the stranding. This survey was made by James H. Gamblin, Henry C. Lightbourne and Charles Smith, assisted by two divers, Charles Sweeting and William Glinton.

Gamblin testified that he was a merchant and Lloyd's surveyor; that he had been called on to act as such on several occasions, and that he was familiar with ships and shipping; that he had been the chief officer of a vessel for ten years and was at one time chief officer of one of the Cunard steamships. He testified:

" We found her sheer line hogged fully ten inches amidships, the upper deck waterway scarfs broken, butts open, joiner work in the cabin started, some of the bulkheads down, and with a general appearance of being badly strained; she had steam up in the starboard boiler to pump with the donkey engine, which was constantly going, her rate of leakage being about eight inches an hour, she then lying in smooth water. All the signal wires were broken, both of her boilers had shifted, starting the brace bolts and breaking one brace entirely. The port boiler was crushed across the saddle bearing about ten inches in length ———

" The hogging of the vessel and the shifting of the boilers drew out the slip joints of the main steampipe about twelve inches. The safety valve of the donkey engine was broken, the escape pipe crushed flat, the fire pipes broken, fire room ventilating plates broken, worming of several screws and nut bolts broken, holding down bolts were some of them started and others broken, her smokestack was started forward about twelve inches, the hurricane deck rails cut down and the port lifeboat damaged. We discovered that by reason of the damages sustained, that the said steamship was in a bad condition and unseaworthy in reference to her prosecuting her voyage."

Lightbourne, the other surveyor, testified that he was port officer of the port of Nassau, and that for thirteen years he had acted as surveyor of wrecked and injured vessels. He testified that he could not at that time describe the injuries to the vessel, but that they were accurately set forth in a report made October 25, 1878, which was not received in evidence.

Smith, who was an engineer, testified that he had been familiar with steamships for many years and had been engaged in repairing their machinery. The following is his description of the condition of the machinery :

" I found her at anchor afloat. I discovered the main steam pipe slip joint drawn out, so far as I can now remember, ten or twelve inches. I found in the fire room that the leg of the port boiler had forced its way, and cracked the boiler through about eight or ten inches right under the front part of it. The safety-valve escape pipe was crushed flat against a beam of the upper deck. I also

observed that the globe valve of the donkey pump was cracked in two. These were all the injuries pointed out to me in the machinery, engines and boilers, by the chief engineer. I could see that the cracked boiler had started from its position.

" Q. What did you discover by the said examination or survey to be the condition and seaworthiness of the said steamship with reference to her prosecuting her voyage ?

" A. I discovered that from the injuries I have just explained the ship was not in a fit condition or seaworthy for prosecuting her voyage."

He further testified that the vessel could not have been permanently repaired at Nassau, for the lack of machinery, foundries and facilities; that the boilers, engines and machinery could not have been repaired without taking them out, and that no facilities existed at Nassau for doing that work. He also stated that the marine railway at that port was not strong enough to take up the *Cleopatra.*

The divers testified that they found the keel ground down to the garboard streak for a long way amidships ; at one place forward it was cut nearly through, so far that they regarded her back as broken, and that they brought up pieces from the keel as large as one of their arms, and several feet long.

November 26, 1878, a second survey was made by Gamblin, Lightbourne and Finlayson, who were appointed by the United States consul. Gamblin described the condition of the vessel as about the same as on the first examination, and testified that, in his judgment, the cost of making permanent repairs would be equal to her value when repaired.

Lightbourne testified : " On the second examination we found, by the aid of water glasses, after the ship had been careened, that in several places the keel was cut down to the garboard. Divers were also sent down. The breast hooks were slightly started. The lodging and hanging knees were gaged, bolts being loose and some of them broken. The between-deck stanchions had been moved, bending the iron straps and starting strap bolts. As far as I recollect, two beams were broken off in the clamps in the engine room on the starboard side, and a lower clamp short across the grain on the port side, several tree nails had started inwards, and I recollect sending them out with a hammer.

" Twenty-second interrogatory : Was or was not the said steamship in a condition fit to prosecute her voyage; was she or not seaworthy ? What do you say as to whether or not the back was broken ?

" [Defendant's counsel objects to the last line of that interrogatory as calling for a conclusion and as leading. Objection overruled. Defendant excepts.]

" Answer. I do not think she was seaworthy. She had the appearance of her back being broken."

He also testified that the cost of making permanent repairs would have been almost equal to the value of the steamship after it had been repaired.

Finlayson, the other surveyor, died before his evidence was taken.

George H. M. Allen, a ship carpenter for over forty years, who had been employed by C. & P. Poillon, and had been their foreman since 1863, testified that he had assisted in repairing the vessel in 1878, and that in June, 1880, he examined her at Baltimore. He said the vessel was hogged about fourteen inches, and described at great detail many imperfections in the ship, and a result of his evidence is that the ship had been badly damaged and was of but little value.

Mr. William D. Dickey, a mechanical engineer, who had been superintendent of a ship yard for eight years, testified that he had assisted in putting in the new boilers and machinery into the *Cleopatra* in 1878 ; that in June, 1880, he examined her with Mr. Allen, at Baltimore. He describes with great particularity the defects of the boilers and machinery, and the result of his evidence is that the boilers and machinery were very greatly damaged, and not of much value.

Gregory M. Mullen, a witness called in behalf of the plaintiff, testified, " I made a measurement with a rule of the actual hog of the vessel when she was on the dry dock in Baltimore, and I put it to be twenty-six inches exactly ; I measured from the garboard streak to the outer edge of the keel."

The learned counsel for the appellant, in his brief, characterizes the evidence of Gamblin, Lightbourne and Smith as willfully false and fictitious. We find nothing in the record to justify this. On the contrary, the agent of the defendant at Nassau, Mr. Samuel O.

Johnson, who was called as a witness in its behalf, testified: "I was acquainted with all of them; Lightbourne, Gamblin and Finlayson have been called by me, and at my suggestion, on surveys. I know nothing derogatory to their characters."

Nor do we find anything in the testimony of Mr. George H. M. Allen which justifies the assertion that he "went to see the vessel in Baltimore for the sole purpose of finding her a subject for abandonment."

As against the evidence of these witnesses the defendant produced testimony to the effect that the vessel was not seriously injured and that it might have been repaired by the expenditure of less than one-half of its valuation, deducting one-third from new for old.

The subsequent history of the *Cleopatra* does not seem to be inconsistent with the theory that she was a constructive total loss. She remained in the harbor at Nassau until February 23, 1880, one year and four months after the stranding, when she was sold by public auction to Charles Winternitz & Sons of Baltimore, Md., dealers in old iron and machinery. She was first offered for sale February 10, 1880, by the auctioneer at $4,000, but no bids being received the sale was adjourned until February twenty-third, when the ship was sold for £220. Between that date and May 15, 1880, she was temporarily repaired at Nassau at an expense of $858.08, and on the latter date sailed for Baltimore where she arrived on the twenty-fifth of the same month. Between the latter date and December 15, 1880, she was repaired at Baltimore at an expense of $5,484.37, and on the date last named she was sold for $14,000 and a vessel valued in the trade at $6,000.

The learned counsel for the appellant cites in support of his argument upon this branch of the case many English cases and authorities, to the effect that a ship cannot be abandoned as a constructive loss unless it is so damaged that it cannot be rendered navigable again, except at a cost greater than her repaired value. It is only necessary to say of this class of authorities that they do not express the rule of this State, nor the rule to which these litigants bind themselves by the policy.

Under this state of the evidence the question was a fair one for the jury, and we are not inclined to disturb the verdict upon the ground that it is contrary to the weight of evidence.

The defendant called Nathan B. Perrets, who was interested with Winternitz & Sons in the purchase and sale of the vessel. He testified to its condition in February, 1880, when lying at Nassau, and that he purchased her February 23, 1880, for the above-mentioned firm. He also testified to the amount expended at Nassau in repairs, and to the amount expended in Baltimore for the same purpose, and that " the last I knew of her she was for sale in Baltimore."

On the cross-examination the plaintiff was permitted to show by this witness that he paid £220 for the vessel at the auction sale, and that December 15, 1880, Charles Winternitz & Sons exchanged her for a vessel called the *Falcon*, valued in the trade at $6,000, and for $14,000 in cash and notes.

It is urged by the appellant that evidence of the price obtained for the vessel was not competent. Undoubtedly it would not have been competent for the plaintiff to have given evidence of the price obtained for the vessel at a private sale made more than two years after the stranding. (*Roe* v. *Hanson*, 5 Lans. 304; *Flannagan* v. *Maddin*, 81 N. Y. 623; *People ex rel. Mayor, etc.,* v. *McCarthy*, 102 id. 630, 639; 2 Whart. Ev. § 1290.) But the defendant had, by this witness, given evidence of the condition of the vessel when purchased at Nassau, of the amount expended on her in that harbor and the amount expended in repairing her at Baltimore. The purpose of this evidence was to show that the vessel was of such value that it could not be regarded as a constructive total loss. On the cross-examination it was competent to show the amount for which the vessel was sold at these dates for the purpose of enabling the jury to judge what weight should be given to the evidence of this witness bearing upon the value of the ship.

It may be noted in this connection that Samuel O. Johnson, sworn in behalf of the defendant on commission, testified, in speaking of the cost of the vessel and repairs at Nassau, " the purchase and repairs, I was informed, amounted to about $5,000."

Was a legal abandonment effected? As before stated, the owners gave the defendant written notice of abandonment on the 18th of December, 1878, in which the plaintiff did not join. It is now asserted that the owners having mortgaged the vessel, and the insurance being payable by indorsement to the mortgagee, that they were without power to make a legal abandonment. The mortgage is in

the ordinary form, and contains in form an absolute conveyance of the title with a defeasance. It recites that it is made to secure the payment of forty bonds of $500 each, with interest, and that when they are paid the mortgage shall be void. The mortgage further provides : " And until default shall have been made by the parties of the first part in payment of said bonds, the parties of the first part shall be permitted to possess and use the said steamship and appurtenances, and to repair and renew the same, and to take and use the income thereof, and apply the same to the necessary current expenses and the purchase of necessary machinery and equipments, or dispose of the same for the lawful uses of the mortgagors in any manner not inconsistent with this mortgage."

It provides that in case default shall be made in the performance of any of the mortgagors' covenants that the mortgagee may take possession of the vessel and sell or dispose of the same at public or private sale. The mortgagors covenanted that they would keep the ship insured for at least $25,000 and assign the assurances to the mortgagee as additional security.

A legal abandonment cannot be effected unless the person who assumes to make it has, at the time of the loss, the power to make a legal transfer of the property abandoned. (2 Pars. Mar. Ins. 119; 2 Arn. Mar. Ins. [6th ed.] 956.)

In *Hunt* v. *The Royal Exchange Assurance* (5 M. & S. 47), it was held that where an assurance was effected by part of the owners they might make a legal abandonment for all of the joint owners.

In *The Chesapeake Ins. Co.* v. *Stark* (6 Cranch, 268), it was held that an agent who procured an insurance for his principal and who abandoned the subject of the insurance must, in the absence of evidence that he was without authority, be presumed to have had authority to make the abandonment.

In *Gordon* v. *Massachusetts F. & M. Ins. Co.* (2 Pick. 249, 260), a vessel was insured in the name of the plaintiff, who was the owner. Afterwards he executed an absolute bill of sale of the ship which contained no defeasance. By the instrument the title to the property was not to revest in the plaintiff upon the performance of any condition. It was shown, however, on the trial that the bill of sale was intended as security for the payment of debts due from the owner to the transferee. It was held that by virtue of the absolute

transfer, the plaintiff had divested himself of the legal title to, and dominion over, the property, could transfer none and could not abandon it to the insurers.

In *Bidwell* v. *North Western Ins. Co.* (19 N. Y. 179), the defendant insured a vessel on account of Crocker, the owner, the loss, if any, payable to Bidwell, the mortgagee. It was stated in the policy that there were no other liens upon the vessel. A loss occurred, and it turned out that there were two prior mortgages on the vessel. It was held that the insurance was of Crocker, the owner, upon the vessel, and not of Bidwell upon his interest as mortgagee of Crocker's equity of redemption, and that the mortgagee could not recover on the policy. In the case at bar, the insurance was of the interest of the owners, not of the interest of the mortgagee.

In *Younger* v. *Gloucester Marine Ins. Co.* (Sprague, 236 ; affd., 2 Curtis C. C. 322), it was held that the master of the vessel has not, by virtue of his office, authority to abandon her to the underwriters.

In all the cases the right to abandon turned on the power of the person tendering abandonment to transfer title to the subject of the insurance to the insurer. In the case at bar the owners had the undoubted right to transfer the vessel to the insurer, and, therefore, could effect a legal abandonment of her. In addition, the owners procured the insurance for the mortgagee, who subsequently, March 12, 1879, notified the defendant that the owners' notice of abandonment of December 18, 1878, was given with his authority and that he ratified and confirmed it. This brings the case within the principle of *The Chesapeake Ins. Co.* v. *Stark* (*supra*). It appears in this case that June 20, 1878, the owners mortgaged the vessel to Joseph K. Murray to secure the payment of $6,000, and June 21, 1878, to Murray to secure the payment of $4,000, both mortgages falling due September 14, 1878. These mortgages are not in the case, and we are ignorant of their terms, nor do we know that they were unpaid when the vessel was stranded.

Was the abandonment timely? November 26, 1878, the second and final survey was made, and a notice of abandonment was served December 18, 1878. The case does not disclose how frequently mails were transmitted between Nassau and New York, nor whether there was telegraphic communication between those ports, although

it appears inferentially from the letter of Murray, Ferris & Co., of November 15, 1878, put in evidence by the defendant, that Savannah was the nearest and most convenient telegraph station.

In *The Chesapeake Ins. Co.* v. *Stark,* Chief Justice MARSHALL, speaking for the court, said : " The law is settled that an abandonment, to be effectual, must be made in reasonable time ; but what time is reasonable is a question compounded of fact and law, which has not yet been reduced to such certainty as to enable the court to pronounce upon it, without the aid of a jury. Certainly the delay may be so great as to enable every man to declare, without hesitation, that it is unreasonable, or the abandonment may be so immediate that all will admit it to have been made in reasonable time ; but there may be such a medium between these extremes as to render it doubtful whether the delay has been reasonable or otherwise. If it was a mere question of law which the court might decide, then the law would determine, to a day or an hour, on the time left for deliberation, after receiving notice of the loss. But the law has not so determined, and it, therefore, remains a question compounded of fact and law, which must be found by a jury under the direction of the court."

The defendant asked the court to decide, as a matter of law, that the abandonment was not made within a reasonable time, but made no request that any question of fact involved in that issue be determined by the jury, thus leaving the court to determine all questions and inferences of fact arising from the evidence bearing on this question. The facts and inferences from them having been found against the defendant; it is not apparent that the question of reasonable time was erroneously determined by the court.

It is urged that the court erred in not dismissing the complaint because of the plaintiff's failure to use all reasonable endeavors for the safety of the vessel. Whether the plaintiff and the owners used reasonable efforts for the safety of the vessel was an issue of fact, but neither the court nor the jury was asked on the trial to determine this question either as one of fact or of law, and it cannot be raised for the first time on appeal.

We think the defendant is not in the position to raise the question that the proofs of loss served on it are insufficient. The following are the provisions of the policy : " Proof of loss to be

authenticated by the agent of the company, if there be one at the place where such proofs are taken.    *   *   *   And in case of loss, such loss to be paid in thirty days after proof of loss and proof of interest in the said . . . . . ."  When the proofs were served the defendant did not object to them on the ground that they were not authenticated by its agent, nor for any insufficiency in their form, but the claim was disputed by the defendant on the ground that it was not liable for a constructive total loss.  If the defendant then intended to stand on the defense that the proofs were defective, it should have given notice of the defects claimed so that they could have been corrected.  (*Karelsen* v. *Sun Fire Office*, 45 Hun, 144; 2 May Ins. § 469.)

The defendant read in evidence three letters written by Murray, Ferris & Co. to their agent at Nassau, T. Darling & Co., one dated October 31, 1878, one dated November 2, 1878, and another dated November 15, 1878, also two letters from Murray, Ferris & Co. to the captain of the *Cleopatra*, one dated October 31, 1878, and the other dated November. 2, 1878.  The plaintiff was permitted to read in evidence, over the defendant's objection that they were incompetent, irrelevant and immaterial, two letters from T. Darling & Co. to Murray, Ferris & Co., one dated October 24, 1878, the other October 25, 1878, and also a letter from the captain of the *Cleopatra* to Murray, Ferris & Co., dated November 5, 1878.  The letters introduced by the respective parties all related to the circumstances of the stranding and the extent of the loss, and formed the whole of a connected correspondence between Murray, Ferris & Co., their agent and the captain of the lost ship, and they were competent.  By reading these letters all together and in the order of their dates, they explain one another and furnish a clearer account of the situation than can be obtained by reading only a part of the letters.  The letters received by Murray, Ferris & Co. disclosed what information they had when they wrote letters introduced by defendant.

The defendant pleaded in his answer and proved on the trial as a counterclaim three promissory notes given by Murray, Ferris & Co. to the defendant and held by it.  The first was for $301.25, given December 21, 1877, due December 24, 1878, for the premium on a

policy on the steamer *San Jacinto*; the second, for $901.25, given September 16, 1878, due September 19, 1879, for the premium on the policy in suit; the third, for $721.25, given November 16, 1878, due November 19, 1879, for the premium on a policy on the steamer *Norman.* The policy provides : "And in case of loss, such loss to be paid in thirty days after proof of loss, and interest in the said . . . . . . (the amount of any note or notes given this company for premiums, if unpaid, and all other indebtedness being first deducted)."

The plaintiff consented on the trial to the deduction of the amount of the note given for the premium on the policy in suit, and it was deducted, but the court refused to allow either of the other notes as a counterclaim. The first note was due when this action was begun, and we think it should be allowed as against the claim. The plaintiff is an assignee of Murray; Ferris & Co., and stands in their shoes, and has no right to recover any amount beyond that which Murray, Ferris & Co. could have recovered on the policy. The third note was not due when this action was begun, and was not a counterclaim. The amount due on the second note at the time of the trial was $542.25, and it should have been deducted from the amount due on the policy as found by the jury.

The judgment should be reversed and a new trial ordered, with costs to the appellant to abide the event, unless the plaintiff stipulates, within twenty days after service of notice of the order to be entered on this decision, to deduct from the verdict $542.25, but if the stipulation is given, the judgment is affirmed, without costs in this court to either party.

VAN BRUNT, P. J., and O'BRIEN, J., concurred.

Judgment affirmed, without costs in this court to either party, upon plaintiff giving the stipulation mentioned in the opinion.